THE BANK OF CALIFORNIA, NATIONAL ASSOCIATION, A CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 55537, 60699. Promulgated April 27, 1934.

*V. K. Butler, Jr., Esq.,* for the petitioner.
*H. D. Thomas, Esq.,* for the respondent.

### OPINION.

VAN FOSSAN: These proceedings were brought to redetermine deficiencies in the income taxes of the petitioner for the years 1928 and 1929 in the sums of $2,439.76 and $1,620.52, respectively.

The petitioner alleges that the respondent erred in including in its taxable income interest aggregating $20,331.40 and $14,731.98 accrued to the petitioner on tax-exempt securities during the years 1928 and 1929, respectively.

The petitioner is a national banking association, organized and existing under the National Bank Act of the United States, with its principal banking office in San Francisco, California. R. H. Moulton & Co. was engaged in the investment banking business in that city and specialized in municipal bonds. Practically all of the securities in which it dealt were tax-exempt.

During 1928 and 1929 the petitioner purchased from R. H. Moulton & Co. and other investment dealers certain tax-exempt state, Federal, and municipal bonds and obligations of other political subdivisions. The purchases were made either upon the application of the investment bankers, who held or had commitments for large blocks of bonds which they could not carry themselves, or upon the request of the petitioner, which had available surplus funds desirable for use in obtaining short-term investments. The purchase price was based on, but usually under, the market price plus accrued interest to the date of sale at the coupon rate. Upon the payment of the agreed price, the

securities were delivered to the petitioner under a bill or memorandum of sale. Simultaneously, the petitioner and the "seller" entered into the following standard form of agreement (the blanks being filled in to constitute a typical case):

REPURCHASE AGREEMENT

THE BANK OF CALIFORNIA, N. A., San Francisco, California, a National Banking Association, hereinafter termed "Seller," agrees to sell, and R. H. MOULTON & COMPANY, hereinafter termed "Buyer," agrees to buy the following bonds, namely:

$7,000 CITY OF HANFORD MUNICIPAL IMPROVEMENT 5 % BONDS

Numbers and denominations as follows:

$2,000 Aug. 1, 1958 Nos. 173/74
4,000 " 1961 " 186/89
1,000 " 1963 " 199

The purchase price of each bond is as follows: (Plus accrued interest)

August 1, 1958 maturity @ 95
" 1961 " @ 95
" 1963 " @ 95

payable in United States gold coin of the present standard of weight and fineness, which sum Buyer hereby agrees to pay on or before ninety days from date hereof. Maturing coupons to be the property of THE BANK OF CALIFORNIA, N. A.

And THE BANK OF CALIFORNIA, N. A., hereby agrees on tender of said purchase price of such bonds and interest as aforesaid to deliver to R. H. MOULTON & COMPANY or its nominee, the bonds as above, at any time hereafter, prior to any default on the part of the Buyer.

It is further understood between the two parties hereto that partial sales and deliveries may be made at the rates stated above.

In the event of any failure on the part of the Buyer to accept and pay for any one or more of said bonds at the time the same is tendered, the Seller shall be released from all obligation in law or equity hereunder and may sell all bonds remaining in its hands without notice and for the best price obtainable, charging the loss, if any, to the account of the Buyer.

Executed in duplicate this 11th day of July 1929.

R. H. MOULTON & COMPANY          THE BANK OF CALIFORNIA, N. A.
[Signed] By ELMER BOOTH          STUART F. SMITH
                                           Vice-President.

The transactions under discussion were entered on the petitioner's books as a credit to the seller at the full amount of the purchase price plus accrued interest and were listed and carired in an account called "Bond Account No. 2," to facilitate their expeditious handling. The petitioner treated its bonds held under the repurchase agreements exactly as it did all its bonds and other investments. Upon the maturity of a coupon attached to a bond it was collected by the petitioner and the proceeds credited to the account "Interest on Investments" on its general ledger. In that account all interest from bonds of whatever nature owned by the petitioner

was entered. In its call and semiannual statements the bonds subject to repurchase were included in its list of bonds and other investments owned by it. The long-term investments carried by the petitioner in its "Bond Account No. 1" and its short-term investments entered in its "Bond Account No. 2" were treated exactly alike from an accounting viewpoint. Likewise, the interest derived from both classes of investments was so treated. The practice was not challenged by the Comptroller of the Currency.

The sale price set in the repurchase agreement was always exactly the same as the original purchase price. The petitioner and the investment dealer adhered strictly to the terms of the repurchase agreement. No supplementary agreement was made to enlarge, modify, or in any way to affect the original agreement or the acts of the parties thereunder. If the bonds were not repurchased at the expiration of the period named in the agreement no extension was given, but occasionally an entirely new agreement was executed, accompanied by a new bill of sale at a price based on the current market. At times the petitioner did not agree to a new contract and the bonds would be repurchased by the dealer and sold to another bank. Often the investment banker repurchased at intervals portions of the bonds held by the petitioner under the repurchase agreement.

The yield to the petitioner under the repurchase agreements was less than that received from collateral loans. The petitioner often made loans to customers with tax-exempt securities as collateral.

The petitioner kept its books on the accrual basis.

The amount of interest in controversy, aggregating $20,331.40 and $14,731.98, respectively, during the years 1928 and 1929, was computed by adding the amount of the matured coupons actually cashed by the petitioner, the amount of the accrued interest received by it upon resale, and the amount of interest accrued on the bonds held by the petitioner at the close of the year, and subtracting therefrom the amount of accrued interest paid by the petitioner upon the original purchases from the investment dealers.

The petitioner contends that the transactions described constituted an outright sale from the investment dealers to it and that, hence, the interest accrued and received while the bonds were so owned and held by it was exempt from taxation under section 22 (b) (4) of the Revenue Act of 1928.[1] The respondent's position is that, in

---

[1] (b) *Exclusions from gross income.*—The following items shall not be included in gross income and shall be exempt from taxation under this title:

      \*       \*       \*       \*       \*

    (4) TAX-FREE INTEREST.—Interest upon (A) the obligations of a State, Territory, or any political subdivision thereof, or the District of Columbia; or (B) securities issued under the provisions of the Federal Farm Loan Act, or under the provisions of such Act as amended; or (C) the obligations of the United States or its possessions. \* \* \*

substance, the transactions represented loans made by the petitioner to the dealers with the tax-exempt bonds hypothecated therefor and that, therefore, the interest on such bonds belonged to the dealers and not to the petitioner. Consequent on this position respondent added the amounts of the interest to petitioner's income as interest received on loans.

In his brief respondent's counsel asks us to disregard entirely the form of the sale, the repurchase agreement, and the whole transaction and to read into it a " substance " consonant with his theory that it was merely a loan. To do so, we would be compelled not only to disregard the contractual relation established by documentary proof and the practical treatment of the interest received, but also to ignore the testimony of witnesses, some of whom were the respondent's own. It is true that from the Moulton Co.'s viewpoint the financial support of the petitioner was useful in obtaining and placing tax-free securities, such as municipal, district, county, and State bonds, but petitioner's primary object was plainly to benefit itself by securing an attractive investment for its idle funds. It is obvious that when a financial institution finds itself overburdened with an excessive amount of cash which it can not lend through ordinary channels, it must seek and obtain short-term investments which will yield some returns, usually at less than the current interest rate, yet will permit a prompt conversion into cash when needed. Such short-term investments were bankers' acceptances, commercial paper, and tax-exempt securities. All were bought by the petitioner as it found opportunities to do so. ˙

The respondent stresses the fact that the Moulton Co. could repurchase at any time and in any number of units the bonds transferred to the petitioner. We attach no particular significance to this privilege other than that it indicates the flexibility of the repurchase contract. However, the contract also contains this paragraph:

In the event of any failure on the part of the Buyer to accept and pay for any one or more of said bonds at the time the same is tendered, the Seller shall be released from all obligation in law or equity hereunder and may sell all bonds remaining in its hands without notice and for the best price obtainable, charging the loss, if any, to the account of the Buyer.

Thus, whenever the petitioner needed to convert its short-term investment into cash for use in the normal course of business, it had the right to tender such bonds as it desired to resell and if the Moulton Co. were unable to purchase any or all of such bonds, petitioner could dispose of them on the market. This provision is inconsistent with the theory that the transaction was a loan.

Counsel for both the petitioner and the respondent rely on our decision in *First Nat. Bank in Wichita*, 19 B.T.A. 744; affd., 57 Fed.

(2d) 7. A careful analysis of the facts of that case shows clearly that it supports the petitioner's position rather than that of the respondent. There we said:

It seems clear that at the time the petitioner solicited this business from the Brown-Crummer Co. it had on hand a large surplus of unemployed funds and that that company was in the market for loans. The maximum amount of credit the petitioner could extend to this company by way of a direct loan, under the law, was $200,000; this credit it readily gave to the company upon its collateral note. The company, however, required amounts greatly in excess of this; and, since it was dealing in large issues of municipal securities which constituted approved banking investments, the sale with repurchase agreement was evolved and brought into play. The petitioner contends that through this process it acquired a complete title to these bonds which the repurchase agreement in no way impaired, and that, because of that fact, the interest payments were its income, and being tax-exempt, it was entitled to exclude them from its income-tax returns. We think there could be no question as to the soundness of the petitioner's contention had it taken title to these securities subject to no conditions other than is evidenced by the repurchase agreements; however, other established facts show that other considerations formed the motives of the parties to the transactions.

The question here, as we view it, is not dependent upon who held the bare legal title to the bonds during the dates of sale and repurchase, but rather upon the broader issue as to who, under the understanding between the bank and its customers, was entitled to receive, and who, as carried out, did receive the interest payments made by the issuing authorities of such bonds when collected and paid. The record shows that the true relationship between the petitioner and its customers, in these transactions, was that of a lender of money in consideration for the legal rate of interest payable on the amount advanced, and not that of an investor in the securities assigned to it by such customers. The history of these transactions and the manner in which they were carried out can lead to no other conclusion.

In reviewing the case, the Circuit Court of Appeals commented thus:

There is no doubt of the exemption from income taxes of the interest on these securities in favor of the person or persons who were entitled to receive it and did receive it. So, the issue is one of fact.

\* \* \* \* \* \* \*

It is contended that the written contract made by the parties when the bonds were delivered passed legal title to the bonds in the bank, and by force thereof interest on them was the bank's property. There is no doubt that the form of contract might have been carried out in that way, but the blanks in the contract submitted to the comptroller left an opportunity to the bank of which it availed itself, and the practice as carried on by the parties clearly shows that it was never intended that the bank should be entitled to the interest accruing on the bonds. Conceding that under the contract the legal title to the bonds was in the bank, the uniform conduct and practice of the parties was a joint admission that the interest coupons and their proceeds when collected did not belong to the bank, but were the property of Brown-Crummer Company. They were collected by Brown-Crummer Company and applied to its use and benefit.

\* \* \* \* \* \* \*

*. * * The bank got none of the interest that accrued on the bonds. It was not entitled to it. Brown-Crummer Company paid the bank all its interest charges.

The facts in the cited case are very different from those in the case at bar. There the bank paid par, not market value, for the bonds, and was guaranteed against loss. The interest was the current loan rate—not the coupon rate. There, upon the maturity of the interest coupon, the bank clipped the coupon and delivered it to its customer; here, the petitioner collected the coupon and credited the proceeds thereof to its own interest account. In the *Wichita* case the customer made monthly interest adjustments on its loans without reference to the coupons collected or interest due from the tax-exempt securities. In the instant case no such method was employed. There, unlimited withdrawals and substitutions of bonds were permitted and made. Here, the same securities were made the subject of resale and no substitutions, withdrawals, or renewals were contemplated or allowed.

Furthermore, in the repurchase contract under consideration the petitioner was not required to account to the Moulton Co. for any surplus upon a sale, but could hold that company for any deficiency. Under California law the petitioner would be required to account for the surplus from the sale of collateral or under a chattel mortgage. (Code of Civil Procedure, sec. 3008.)

Moreover, the record shows that no special considerations or conditions other than those set forth in the contract motivated the actions of the parties. In this respect the case at bar differs basically from the *First Nat. Bank in Wichita* case. As we view the repurchase agreement, it granted to the Moulton Co. the right to purchase upon stated terms certain securities which were the property of the petitioner and to which petitioner had title. At most, the agreement might have restricted petitioner's ability to sell to a third person with knowledge, but that possibility could have no effect on its ownership of the property. The right to collect the interest coupons and the benefit of the accrued interest on the bonds were natural incidents to that ownership. The treatment of interest by the parties is corroborative of this conclusion.

There is no evidence that the repurchase plan was a device contrived for the purpose of tax evasion or even tax avoidance. On the contrary, the record indicates that the arrangement was a well established custom in San Francisco banking circles, resulting from the bank's need to put its surplus funds to work, but in such form as to be liquid and constantly available.

In view of the facts in the case before us, we are of the opinion that the tax-free securities belonged to petitioner and that the inter-

est received by and accrued to the petitioner from such securities as were covered by the repurchase agreements as above set forth is exempt from taxation under the provisions of section 22 (b) (4) of the Revenue Act of 1928.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

TRAMMELL dissents.