### The CITIZENS NATIONAL BANK OF WACO

v.

### The UNITED STATES.

No. 390–74.

United States Court of Claims.

March 23, 1977.

David B. Kultgen, Waco, Tex., Atty. of record, for plaintiff. Beard & Kultgen, Waco, Tex., of counsel.

Robert N. Dorosin, Washington, D. C., with whom was Acting Asst. Atty. Gen., Myron C. Baum, Washington, D. C., for defendant. Theodore D. Peyser and Donald H. Olson, Washington, D. C., of counsel.

Before SKELTON, NICHOLS and BENNETT, Judges.

## OPINION

SKELTON, Judge:

This is a suit by The Citizens National Bank of Waco, a national bank located in Waco, Texas (Bank or Taxpayer), to recover federal income tax deficiencies and interest assessed against it by the Commissioner of Internal Revenue Service for the years 1968 and 1969, in the total sum of $63,863.24, together with interest as provided by law.[1] The case is before us on an agreed stipulation of facts. We have carefully considered the pleadings, the briefs and the oral argument of counsel, along with the stipulation of facts, and have concluded that the law and the facts are with the plaintiff. We hold for the plaintiff.

The stipulation of facts is relatively short and rather than attempt to summarize its contents, we deem it advisable to reproduce it in full, minus exhibits, so that all facts agreed upon may appear in this opinion. The stipulation of facts, which describes the nature of this controversy, is as follows:

It is hereby stipulated and agreed by and between the parties hereto, by their respective attorneys, that for the purposes of this case only the following facts shall be taken as true and that such facts, together with the appended exhibits, which are submitted to show the agreed contents of such documents, represent all of the facts necessary for the Court's disposition of this matter. No further proof is to be offered by either party.

1. Plaintiff is a national banking corporation having its only office in Waco, Texas. As a national bank, plaintiff offered a full line of commercial banking services during the years in question, 1968 and 1969. During 1968 and 1969, the approximate loan limit of the plaintiff was $800,000, or 10 percent of its capital and surplus accounts under applicable banking regulations.

2. American Amicable Life Insurance Company (American Amicable) is a life insurance company having its principal office in Waco, Texas. The principal office of American Amicable is located approximately one-half block from the office of the plaintiff in Waco, Texas.

3. During 1968 and 1969, and for many years prior thereto, American Amicable maintained a checking account with the plaintiff and regarded the plaintiff as its main bank. During 1968 and 1969, the average balance of the checking account of American Amicable with the plaintiff ranged from $100,000 to $300,000, which was a large account for a bank of plaintiff's size. There had long been a close banking

---

1. It has been agreed between the parties that if the plaintiff prevails in this action the amount of its income tax recovery and assessed interest, plus statutory interest will be computed in proceedings under our Rule 131(c).

relationship between American Amicable and the plaintiff.

4. American Amicable annually published financial statements which were kept on file by the plaintiff at its office. Plaintiff's president during the years in question, Walter G. Lacy, was a stockholder and a former director of American Amicable.

5. During 1968 and for many years prior thereto, American Amicable maintained a substantial investment in municipal bonds issued by various municipalities and school districts of the State of Texas. These Texas municipal bonds were purchased by American Amicable primarily as long-term investments to obtain the benefit of tax-exempt interest from the bonds. American Amicable periodically purchased these bonds at the then current market price through various brokerage firms in Waco, Texas. These brokerage firms presented to the officers of American Amicable comprehensive background information on the bonds including the credit standing of the issuing municipality, the coupon or stated interest, the current yield, the yield to maturity, the net yield, the par amount of the bonds, and the then present market price of the bonds. American Amicable also occasionally sold the Texas municipal bonds at the then current market price through brokerage firms in Waco, Texas.

6. Plaintiff, acting through its president, Walter G. Lacy, similarly at various times purchased municipal bonds issued by various municipalities and school districts of the State of Texas in prior years and during 1968. These Texas municipal bonds were purchased at the then present market price by the plaintiff primarily for short-term investment from various brokerage firms in Texas. Plaintiff confined its acquisition of Texas municipal bonds to maturity periods of less than 10 years, and it generally planned to hold such bonds until their maturity. In determining whether the plaintiff should purchase particular Texas municipal bonds with short-term maturities of less than 10 years, Mr. Lacy examined the credit worthiness of the issuing political subdivision, the current market price for the bond, the par amount stated on the bond, the current yield, the yield to maturity, the net yield, and the coupon or stated interest on the bond.

7. At all relevant times, American Amicable was a subsidiary company of the parent holding corporation, Great American Corporation. E. Grant Fitts, the chief executive officer of Great American Corporation, exercised effective control over the management of American Amicable. Shortly before May 22, 1968, Mr. Fitts made a commitment on behalf of American Amicable to purchase $5,000,000 in notes issued by the LTV Corporation. This commitment was made by Mr. Fitts without prior consultation with Franklin Smith, the then president of American Amicable. After making the commitment, Mr. Fitts informed Mr. Smith that it had been made. Mr. Smith notified Mr. Fitts that American Amicable did not have sufficient cash to meet the commitment deadline. As the superior of Mr. Smith, Mr. Fitts insisted that American Amicable obtain the money to honor its commitment. Mr. Fitts told Mr. Smith to obtain the cash for American Amicable by selling its stocks or bonds.

8. Because of the close banking relationship between American Amicable and the plaintiff, Mr. Smith met with Mr. Lacy, president of the plaintiff, and informed him that American Amicable needed cash to fulfill its commitment to purchase notes or debt obligations of the LTV Corporation. As president of American Amicable, it had been Mr. Smith's policy not to borrow money on behalf of American Amicable. Mr. Smith stated to Mr. Lacy that he did not want a loan; he wanted to sell a block of municipal bonds held by American Amicable to the plaintiff for cash. Mr. Smith and Mr. Lacy agreed that American Amicable would transfer to the plaintiff various municipal bonds issued by political subdivisions of the State of Texas with a total par value in the amount of $2,227,000 plus accrued interest, and that plaintiff would furnish American Amicable with cash equal to the above total par amount of these Texas municipal bonds plus accrued interest. Mr.

Lacy agreed to allow American Amicable to select the Texas municipal bonds from its portfolio, provided that American Amicable chose municipal bonds with larger par amounts rather than many different bond issues of smaller par amounts, and with an overall average coupon or stated interest rate of approximately 4.75 percent. At the insistence of Mr. Lacy, Mr. Smith agreed that American Amicable would be obligated to reacquire these Texas municipal bonds at the same par value amount plus accrued interest upon the demand of the plaintiff. Mr. Smith further agreed to Mr. Lacy's request to set forth the agreement between American Amicable and the plaintiff in writing, including, specifically, the above reacquisition commitment.

· 9. In a letter of May 22, 1968, from Mr. Smith, president of American Amicable, to Mr. Lacy, president of the plaintiff, Mr. Smith stated as follows:

> In accordance with our conversation and agreement, this Company is currently *selling* to your bank a group of Texas Municipal Bonds at par value plus accrued interest. These bonds have an average coupon rate of 4.74 per attached list.
>
> In connection with this sale and additional sales, this Company guarantees to *repurchase* these Bonds on the same basis upon demand from your bank.

In tabular form, Mr. Smith listed on the attachment to his letter the Texas municipal bonds with their par value, coupon or stated interest rate, annual interest, year or years of maturity, and the months in which the bond interest would be paid.

10. According to Mr. Lacy, he insisted that American Amicable be committed to reacquire these Texas municipal bonds at the same par amount plus accrued interest upon demand of the plaintiff because of the plaintiff's concern with liquidity. Since many of the deposits with commercial banks can generally be withdrawn upon demand by their depositors, commercial banks must constantly be aware of their obligations to pay cash upon the request of the depositors. Commercial banks, there-fore, are required to maintain a substantial portion of their assets in cash or in relatively short-term instruments which can be readily converted to cash. Mr. Lacy believed that the plaintiff subsequently might need substantial cash to meet the withdrawal demands of its depositors and would be compelled to dispose of these municipal bonds containing long-term maturities for a substantial loss if the market were depressed at the time when the bank needed to sell the bonds. For this reason, Mr. Lacy was not willing to allow the plaintiff to acquire the municipal bonds in question, almost all of which contained long-term maturities exceeding 10 years, without assurance that the plaintiff could sell or dispose of them without loss and without delay.

11. Under its commitment to reacquire the Texas municipal bonds at the same par value amount upon demand of the plaintiff, American Amicable incurred the risk of loss if the market price of the municipal bonds was less than the total par amount of the bonds. While there was no discussion or agreement among the parties as to the remedy of the plaintiff in the event of a highly improbable default by American Amicable under its bond reacquisition commitment, the plaintiff was fully aware that it had an enforceable obligation against American Amicable.

12. Plaintiff entered into this transaction with American Amicable because of the attractive average overall coupon interest rate of 4.74 percent on the Texas municipal bonds. In 1968, plaintiff was in the 52-percent corporate income tax bracket, and its average annual interest rate charged on commercial loans at that time was 8 percent. Assuming that the coupon · interest on the Texas municipal bonds would be tax-exempt income for the plaintiff, the net yield to the plaintiff after income taxes would be approximately 9½ percent, or a much more favorable return than its taxable 8-percent interest return on loans to corporate borrowers.

13. On or about May 22, 1968, American Amicable actually transferred to the plaintiff municipal bonds issued by various Tex-

as municipalities and school districts with a total par amount of $2,227,000, plus accrued interest, and plaintiff transferred cash in the amount of $2,227,000, plus accrued interest, to the account of American Amicable.

14. Prior to its acquisition of the Texas municipal bonds in question, plaintiff made no effort to determine the actual market price of any of these bonds. The plaintiff also knew that the price at which these bonds were selling in the market varied from par in almost all cases. While it held possession of these municipal bonds, plaintiff never undertook to ascertain the actual market price of any of these bonds, except when it made an annual determination of market value of all bonds held by it.

15. As of May 22, 1968, American Amicable was highly solvent, and there was no reasonable probability that it would be unable to fulfill its commitment to reacquire the Texas municipal bonds at the same par amount upon demand by the plaintiff. Both the plaintiff and American Amicable anticipated when the plaintiff acquired the municipal bonds that American Amicable would rapidly reacquire these bonds as permitted by its cash flow. At the aforementioned meeting between Mr. Smith and Mr. Lacy, Mr. Smith notified Mr. Lacy that American Amicable would reacquire these Texas municipal bonds as fast as it could justify, depending upon its normal cash flow. American Amicable wanted to reacquire these municipal bonds because they represented a good, safe investment with a tax-exempt interest yield. In reply, Mr. Lacy explained to Mr. Smith that the plaintiff was entering into the transaction based upon the overall average coupon interest rate of 4.74 percent on the bonds. Consequently, he expected American Amicable to keep this overall average coupon interest rate intact as it reacquired the bonds. Plaintiff would have strongly objected if American Amicable had proceeded to initially reacquire the higher coupon interest bonds and thereafter reacquire the smaller coupon interest bonds. American Amicable reacquired the municipal bonds in an equitable manner with respect to the maintenance of the average overall coupon interest rate.

16. Plaintiff never made a demand upon American Amicable to reacquire the Texas municipal bonds in question. As permitted by its cash flow, American Amicable throughout 1969 regularly reacquired these municipal bonds by making requests for reacquisition of such bonds to the plaintiff by telephone or in person. Although there was no agreement that the plaintiff was required to allow American Amicable to reacquire such bonds upon its demand or request, plaintiff always honored these requests of American Amicable.

17. The last two municipal bonds held by the plaintiff were reacquired by American Amicable on December 11, 1969. As American Amicable reacquired these municipal bonds, the only necessary computation for the parties was the calculation of accrued interest because the par value of the bonds was the same.

18. The transaction in question between the plaintiff and American Amicable furnished financial assistance to American Amicable by making available cash needed to purchase the notes of the LTV Corporation.

19. Although Mr. Smith and Mr. Lacy believed that the plaintiff was free to sell or otherwise dispose of these bonds to parties other than American Amicable, the plaintiff made no effort to dispose of these bonds. The plaintiff merely held these bonds until reacquired by American Amicable and collected the interest income from the bonds.

20. During 1968, the plaintiff collected interest on the Texas municipal bonds in the amount of $40,287.25. During 1969, the plaintiff collected interest from the Texas municipal bonds in the amount of $64,250.48.

21. On its federal income tax returns for the years 1968 and 1969, the plaintiff treated such interest as tax-exempt income which it excluded from its gross income under Section 103(a)(1) of the Internal Rev-

enue Code of 1954. On audit, the Commissioner of Internal Revenue, among other adjustments, included in plaintiff's gross income for the years 1968 and 1969 the interest income collected by the plaintiff from the municipal bonds in question.

22. The Commissioner determined income tax deficiencies against the plaintiff for the years 1968 and 1969.

23. Plaintiff paid an income tax deficiency of $30,292.75, plus assessed interest in the amount of $5,577.18, for a total of $35,869.93 on May 16, 1972, with respect to its calendar year 1968, and plaintiff paid an income tax deficiency of $61,586.40, plus assessed interest in the amount of $7,623.21, for a total of $69,209.61 on May 16, 1972, with respect to its calendar year 1969.

24. On November 28, 1973, plaintiff filed a claim for refund for the year 1968 in the amount of $21,271.80 plus interest in the amount of $3,915.80. Also, on November 28, 1973, plaintiff filed a claim for refund in the amount of $33,924.25 plus interest in the amount of $4,751.39. The Internal Revenue Service denied these claims for refund on June 14, 1974, and the plaintiff timely filed a petition in this Court on November 8, 1974.

25. If the plaintiff should prevail in its contention that its transaction of May 22, 1968, with American Amicable constituted a bona fide sale rather than a secured loan for tax purposes, the amounts of income tax and deficiency interest to be refunded to the plaintiff, which are attributable to inclusion in its gross income of the interest income from the municipal bonds, will be computed in proceedings under Rule 131(c).

The defendant contends that the transfer of the bonds by American Amicable (Amicable) to the Bank was not a sale but was a loan made by the Bank to Amicable to either purchase or carry the bonds, which were held as collateral by the Bank to secure the loan, all of which resulted in a double tax exemption prohibited by Section 265 of the Internal Revenue Code of 1954, which provides as follows:

§ 265. Expenses and interest relating to tax-exempt income.

No deduction shall be allowed for—

\* \* \* \* \* \*

(2) Interest.

Interest on indebtedness incurred or continued to purchase or carry obligations \* \* \* the interest on which is wholly exempt from the taxes imposed by this subtitle. [26 U.S.C. § 265 (1970)]

Defendant contends further that in collecting the interest from the issuing municipalities, the Bank was acting as the agent of Amicable.

The defendant also argues that there was an agreement between the parties (by implication) that the Bank was required to resell the bonds to Amicable at any time that Amicable requested it.

The plaintiff Bank, on the other hand, says that the transaction was an outright sale of the bonds to it by Amicable and that there was no agreement or obligation whatever on the part of the Bank requiring it to resell the bonds to Amicable on demand. The Bank points out that it did not advance any money to Amicable to be used by Amicable to purchase the bonds nor to carry the bonds, and that the Bank did not itself buy the bonds from the issuing authorities, but did collect the interest as owner for its own account from the municipalities. The Bank denies that there was a double tax exemption in this case and says that the only tax exemption that occurred was the deduction it made on its income tax which it says it was entitled to under Section 103(a)(1) of the Code which provides as follows:

§ 103. Interest on certain governmental obligations.

(a) General rule.

Gross income does not include interest on—

(1) the obligations of a State, a Territory, or a possession of the United States, or any political subdivision of any of the foregoing, or of the District of Columbia;

\* \* \* \* \* \*

[26 U.S.C. § 103(a)(1) (1970)]

The main issue to be decided is whether the transaction was a sale or a loan. We have concluded that it was a sale. Counsel for the government has made an ingenious argument that it was a loan, however, the facts do not support his loan theory, but point the other way. It occurs to us that defendant's loan theory is just a "theory" that is based largely on speculation, surmise, inference and what might have been the situation, assuming certain vital facts existed. There were too many material facts, some present and some lacking that show the transaction was not a loan. Many of them, some of which overlap, may be listed as follows:

1. There was no debt, existing or created, due by Amicable to the Bank.

2. No note or written evidence of debt existed.

3. There was no evidence Amicable ever promised to pay the Bank anything.

4. No date for the payment of money or repurchase of the bonds existed.

5. There was no mortgage or pledge agreement of the bonds by Amicable to the Bank.

6. No evidence existed that Amicable pledged the bonds as collateral for any kind of loan.

7. There was no provision for default or foreclosure if Amicable did not repurchase the bonds.

8. The president of Amicable stated in the beginning he did not want a loan, but wanted to sell the bonds to the Bank.

9. The transaction was in the form of an outright sale.

10. Amicable was the owner of the bonds when the transaction occurred.

11. The Bank did not advance money to Amicable to buy the bonds from the issuer.

12. The Bank did not buy the bonds from the issuing authority for the account of Amicable.

13. The Bank did not hold the bonds for the account of Amicable, but for its own account as its own property.

14. The Bank did not advance money to Amicable to carry the bonds, as the Bank was not required to resell the bonds to Amicable on demand or otherwise.

15. The Bank collected the interest from the municipalities for its own account and not as agent of Amicable.

16. In collecting the interest on the bonds, there is no evidence whatever that the Bank acted as agent of Amicable. No agency agreement existed.

17. The Bank never accounted to Amicable for interest it collected from the municipalities, nor was it required to do so.

18. Amicable never paid the Bank any interest whatever, except accrued interest on the bonds at the time of repurchase, which is customary in financial circles when bonds are purchased.

19. The Bank never requested Amicable to repurchase the bonds, even though it could have done so.

20. The Bank had the right to sell the bonds to third parties and retain any profit made on such sale as its own property.

21. There is no evidence that Amicable made any entry on its books that it owned the bonds or that it owed the Bank anything on the bonds after they were transferred to the Bank. If its books and records were not correct in this regard, it would no doubt have been in violation of the insurance laws of Texas.

22. There is no evidence that the Bank was guilty of making false entries on its books in violation of national banking laws in connection with the transaction.

23. Amicable did not deduct any interest on the tax-exempt bonds from its

income tax during the time they were owned by the Bank.

Defendant relies on the decisions in *American National Bank of Austin v. United States*, 421 F.2d 442 (5th Cir. 1970), *cert. denied*, 400 U.S. 819, 91 S.Ct. 36, 27 L.Ed.2d 46; *First American National Bank of Nashville v. United States*, 467 F.2d 1098 (6th Cir. 1972); *Union Planters National Bank of Memphis v. United States*, 426 F.2d 115 (6th Cir. 1970), *cert. denied*, 400 U.S. 827, 91 S.Ct. 53, 27 L.Ed.2d 56, to support its position. These cases involve different facts, are distinguishable from the instant case, and do not control our decision, as will be shown below. The cases called to our attention that have been decided in this area of the law are the following: *American National Bank of Austin, supra; First American National Bank of Nashville, supra; Union Planters National Bank of Memphis, supra; Third National Bank in Nashville*, 71–1 T.C. 9248 (1971); *First National Bank in Wichita v. Commissioner*, 57 F.2d 7 (10th Cir. 1932), *cert. denied*, 287 U.S. 636, 53 S.Ct. 86, 77 L.Ed. 551; *Brown-Crummer Co.*, 19 B.T.A. 750 (1930), petition dismissed on motion of the Commissioner, 63 F.2d 996 (10th Cir. 1933); *Commissioner v. Bank of California Nat. Ass'n.*, 80 F.2d 389 (9th Cir. 1935), *aff'g*, 30 B.T.A. 556; and *Commissioner v. Wells Fargo Bank & Union Trust Co.*, 80 F.2d 390 (9th Cir. 1935), *aff'g*, B.T.A., Memo Docket Nos. 49880, 63038.

The Fifth Circuit Court of Appeals pointed out in *American National Bank of Austin, supra*, at 445, that the decided cases on sale-repurchase agreements of municipal bonds announce various criteria for determining where ownership of bonds reside in these situations, and while they are helpful, no single criterion is controlling. We agree that this question must be decided on the facts in each case and that is the procedure we follow in the instant case. The court in the above case decided against the bank and held that the transactions were loans and not sales. However, the facts in that case were vastly different to those in the instant case. There, various bond dealers bid on municipal bonds and in many cases sold the bonds to individual customers before they were issued. The bank had nothing to do with fixing the bid price nor with the bidding or purchase of the bonds. It merely paid for the bonds to the issuing authorities. When the bonds were issued, they were sent to the bank on instructions of the dealers and the bank held them as collateral for the account of the dealers who had "complete dominion over the bonds after they came into the bank's possession." The dealer "sold them at his pleasure, at prices he determined, and without reference to the bank, except that the proceeds were collected from the customer by the bank and applied to the dealer's account. Obviously the inventory of bonds was being held by the bank for the dealers and subject to their disposition. To us the bank was simply a lender of its funds to the dealers. For this service it was paid interest by the borrowing dealers." (*Id.* at 452.) The facts in that case show further that when the dealer had sold the bonds and the bank had collected the money from the customer for the account of the dealer, the dealer reimbursed the bank for the bid price it had advanced, adjusted for interest, and also paid the bank *a handling charge and incidental expenses.* During the time the bank held the bonds for the dealers, it collected interest from the issuing authorities and excluded it from its income tax as tax exempt interest paid to it (as owner of the bonds) under Section 103(a)(1) of the Code. The court held that the bank's alleged ownership of the bonds had no economic substance and that it was not entitled to treat the interest as tax exempt income. We agree that the decision of the court in that case was correct, but point out that the case is clearly distinguishable from our case.

The *Union Planters National Bank of Memphis, supra*, is also distinguishable from the case before us. That case, like the *American National Bank of Austin, supra*, involved transactions between the bank and bond dealers. In fact, the court stated that many dozens of transactions were involved (*see* 426 F.2d 115, n. 3 at 117). The facts in that case show that the bank would pur-

chase bonds from dealers under agreements that the bank could require the dealers to repurchase the bonds at any time without loss to the bank. The district judge also found that the dealers could force the bank to resell the bonds at any time on demand of the dealers.[2] The dealers exercised control over the bonds while they were in possession of the bank by advertising them for sale in trade magazines in complete disregard of the fact they had been transferred to the bank. When the dealers found a purchaser for the bonds, they would obtain the bonds from the bank by paying the bank the amount it had advanced, with adjusted interest. In the meantime, if the market value of the bonds went down, the bank required the dealers to pay sufficient money to protect it from the declining market. The court compared this to the posting of additional margin by a borrower in a falling market situation. The court said in this regard:

> * * * It is clearly more consistent with the characterization of these transactions as loans than as sales [426 F.2d at 117.]

During the times the bank held the bonds, it collected the interest due thereon from the issuing authorities and excluded it as tax-exempt interest in its income tax. The court held this to be improper, as the transactions had no economic substance as sales, but were in fact loans. It should be pointed out that this practice continued over a period of several years and involved many dozens of transactions, with the obvious result that the bank was advancing money to the dealers to finance their purchases and sales of bonds to the general public and that the bank held the bonds for the account of the dealers and subject to their order and that the money advanced by the bank was in fact loans to the dealers to carry on their bond business. No such facts exist in the case at bar.

Bond dealers were also involved in *First American National Bank of Nashville, supra.* We think that case is also distinguishable from the case before us. There the

transactions that were involved, other than certain transfers to trust accounts not material here, were of two categories as follows: "(1) Instead of purchasing municipal bonds for which they had successfully bid, certain bond dealers orally agreed with appellant that the bank would buy the bonds from the issuers and later sell them to the dealers at the price the bank had paid. Until these latter sales occurred, the bank in each case accrued the interest on the bonds at the coupon rate and credited this interest to an exempt-interest account. In no case did a successful bidder fail to buy the bonds from the bank at the bid price. (2) Instead of consummating purchase agreements they had made with bond dealers, certain customers of appellant orally agreed with the bank that it would acquire the bonds from the dealers and later sell them to the customers at the prices it had paid, with adjustments for accrued interest. Here, too, the bank reported the accrued interest as tax-exempt income." (467 F.2d at 1100)

The court, relying on the *American National Bank of Austin* case and the *Union Planters National Bank of Memphis* case, discussed above, held that the transfers to the bank were not sales, that the bank advanced and loaned money to purchase the bonds and held the bonds until redeemed in connection with loans instead of sales. It appears from these facts that as to the first category the bank furnished money to *purchase* the bonds from the issuer which runs afoul of Section 265(2) of the Code so as to deny tax-exemption to the bank as to interest on the bonds. It is not clear whether the bank furnished money to purchase the bonds from the issuer in the second category, but in any event, the bank furnished money to the bank's customers to *carry* the bonds, which prevents the interest from being tax-exempt under Section 265(2) of the Code. None of these facts exist in the instant case.

Other cases cited by defendant are *Third National Bank in Nashville v. United States,* 27 Am.Fed.Tax R.2d 818 (M.D.Tenn.

---

**2.** This circumstance is not present in the instant case.

1971), and *First National Bank in Wichita v. Commissioner*, 57 F.2d 7 (10th Cir. 1932), both of which also involve the financing by banks of bond dealers in the sale of bonds and are distinguishable from the instant case in much the same way the preceding cases have been distinguished. It is significant that the cases relied on by defendant all involve the financing of bond dealers by banks in connection with the sale of tax-exempt bonds to the general public. This contrasts with the instant case where we have a single isolated transaction where no one is involved except Amicable and the Bank. The deal between them appears to have been a straightforward aboveboard arm's-length sale and resale between two reputable business institutions, with no thought or purpose of tax evasion. The defendant has never claimed that the transaction was a sham nor a scheme that was carried out for the purpose of tax evasion. It is likely that had Amicable not repurchased the bonds from the Bank, no tax deficiency would have ever been assessed against the Bank. Nevertheless, the Bank finds itself caught in the backwash of the bond dealer decisions, which the government apparently seeks to extend to the instant case. We think the cases are entirely different, and if there is any similarity, it is very remote and speculative.

The Bank cites *Commissioner v. Bank of California*, 80 F.2d 389 (9th Cir. 1935), aff'g, 30 B.T.A. 556, and *Commissioner v. Wells Fargo Bank & Union Trust Co.*, 80 F.2d 390 (9th Cir. 1935), aff'g, B.T.A., Memo Docket Nos. 49880, 63038 in support of its position. In the *Bank of California* case, the bank bought certain tax-exempt bonds by bills of sale, absolute on their face, purporting to transfer and assign the bonds to the bank at the prices specified therein. The bank collected the interest on the bonds and deducted it from its income tax as exempt income. The Commissioner of Internal Revenue contended that although, in form, the transactions were purchases and sales of bonds, they were intended to be, and were in fact, loans of money by the bank to the seller, secured by a pledge of the bonds and that the bonds never were, in fact, the property of the bank, and that the bank was not entitled to deduct the interest from its gross income. The bank contended that it purchased the bonds and became the owner thereof and, consequently was entitled to treat the interest on the bonds as tax-exempt income. The Board of Tax Appeals upheld the bank (30 B.T.A. 556) and the Commissioner appealed. On appeal, the Ninth Circuit Court of Appeals affirmed the Tax Court, saying:

\* \* \* The Board found that the transactions referred to were actual purchases, not loans of money secured by pledge, and that the bonds belonged to and were the property of respondent. [The bank.] This finding is supported by substantial evidence and is, therefore, conclusive. [Cases cited.] [80 F.2d at 390.]

In the *Wells Fargo* case, the Ninth Circuit Court stated:

The question presented in this case is identical with that presented in *Commissioner v. Bank of California* (C.C.A.) 80 F.(2d) 389, decided this day. What we said in that case is applicable here. [80 F.2d at 390.]

The defendant attacks these cases as being old and out of date and not in step with more modern decisions of the Supreme Court that hold that economic substance of a transaction controls instead of the form of the transaction. This argument is unpersuasive in the instant case, because we hold that the sale of the bonds to the Bank had economic reality and substance.

The Bank points to Rev.Rul. 74–27, 1974–1 C.B. 24 as supporting its position. That ruling, says the Bank, lists conjunctively the factors that must be present in a sale-repurchase agreement in order for the transaction to be a loan instead of a sale, as follows: The seller could require the bank to resell; the bank could require the seller to repurchase; a definite remedy was provided in the event of default of either party; the seller agreed to pay interest at a stipulated rate on the funds advanced by

the bank; and the value of the securities sold did not necessarily equal the amount advanced by the bank. The Bank contends that *all* of these features must be present in the agreement in order for the transaction to be a loan, and says that only two were present, namely (1) agreement of the seller to repurchase, and (2) want of equality of purchase price and market value of the bonds. Three of the listed features are not present says the plaintiff, which are: (1) agreement of the bank to resell, (2) payment by the seller of specified interest on the amount paid, and (3) agreed remedies in case of default. The plaintiff argues that since all of the listed features are not present, the ruling supports the Bank's contention that the transaction was a sale and not a loan.

Defendant counters with the argument that the ruling was grounded upon the economic realities of the underlying transaction and that the policy of the Internal Revenue Service is shown in the ruling to be that substance rather than form governs in situations of this kind. It admits that some of the features of the transaction favor the Bank, but contends that the "indicia of a secured loan clearly predominate over those suggesting a sale." Defense counsel was fair enough to say in his brief:

* * * As frequently happens, however, where federal tax issues turn on the essential nature of a particular transaction, this case involves some indicia pointing each way. * * * [*Id.* at 18.]

At the same time, plaintiff's counsel was frank enough to say in his brief:

* * * While the repurchase agreement in the present case contains some of the listed features [in the Ruling], it lacks others. [*Id.* at 14.]

The court commends counsel for both parties for their candor and forthrightness to the court and to each other in conceding that there are certain facts in the case before us that are favorable to each of the parties. It is now our duty to sift the facts and decide which predominate and control.

The Bank places great emphasis on the fact that it was not required to resell the bonds to Amicable, but could sell them to a third party and keep the profit, if any, due to market value if it desired to do so. The defendant says there was an "implied" agreement that the Bank could be required to resell the bonds to Amicable. This argument is unpersuasive because there is no evidence to support it. We conclude that the Bank was not required to resell the bonds to Amicable. This is a very important fact in this case. It tends to prove and indicates that the Bank was the owner of the bonds and could keep them to maturity or sell them to Amicable or anyone else. Also, this circumstance shows that the Bank did not advance money to Amicable to carry the bonds.

Defendant says that the Bank insulated itself from loss by providing that Amicable would repurchase the bonds at par value on demand. While this arrangement did insulate the Bank from loss, there is no evidence that this was the reason for this provision. Rather, the stipulation of facts (paragraph 10) shows that the Bank wanted to keep itself in a liquid position so that if required it could pay its depositors in cash on demand. This appears to have been a prudent and wise decision on the part of the Bank and one that accords with sound banking practices. The stipulation of facts does not show that any thought was given by the Bank to protect itself from any loss. These facts satisfactorily explain why the Bank required Amicable to repurchase the bonds on demand.

The defendant makes a point that the sale and resale of the bonds were made at par value without regard to their market value. However, there was no proof of the market value of the bonds at any time. If market value was material to defendant's claim, it had the burden of showing such value and its materiality. Having failed to discharge this burden, we must assume that such value was not material to any issue in this case.

■ While we have no doubt as to the meaning of the provisions of the Code involved here as applied to the facts of this case, should there be any doubt it must be resolved in favor of the taxpayer. *See Porter v. Commissioner*, 288 U.S. 436, 442, 53 S.Ct. 451, 77 L.Ed. 880 (1933); *United States v. Merriam*, 263 U.S. 179, 188, 44 S.Ct. 69, 68 L.Ed. 240 (1923); and *Luzier's, Inc. v. Nee*, 24 F.Supp. 608, 610 (W.D.Mo. 1938).

We hold that the transaction involved in this case was a sale, with economic substance, of the bonds by Amicable to the Bank and not a loan made by the Bank to Amicable to purchase the bonds from the issuer or to carry the bonds, and that there was no double tax exemption in the case. We hold further that the Bank as owner of the bonds was entitled to collect the interest from the issuer and deduct it from its gross income under Section 103(a)(1) as tax-exempt income.

### Conclusion

Judgment is entered for the plaintiff against the defendant for the recovery of the deficiency assessment and interest thereon in connection with the bonds in question, together with statutory interest until paid. The case is remanded to the trial judge for a determination of the amount of income tax and deficiency interest to be refunded to the plaintiff which are attributable to inclusion in its gross income of the interest income from the municipal bonds, plus statutory interest, under Rule 131(c) of this court.

NICHOLS, Judge, concurring:

I concur with Judge Skelton's opinion and with the judgment of the court. I would like to add the following comment:

Defendant on oral argument asserted, or admitted, as one prefers, that its position was that the ostensible transactions described in the stipulation were mere shams to cover up what was in reality a loan secured by collateral. There is not much in the stipulation to support this, and what there is appears almost wholly a matter of negative inference, as e. g., the apparent indifference of the parties to the market value of the bonds. Pars. 14 and 17 of the stip. Such a document is a wholly inadequate basis for an argument of the kind defendant makes. In *Kramer v. United States*, 406 F.2d 1363, 1367, 186 Ct.Cl. 684, 692 (1969), the court said:

* * * Here, defendant wants us to infer from the stipulated family relationship that the agreement really imports something different from what it says. It invokes the presumption in favor of the Commissioner's decision and reminds us that the burden of proof is on plaintiff. However, the submission via stipulation, of a contract, without more, satisfies the burden of establishing that the parties agreed to what the contract says. One who intends to argue that there were side agreements, oral, implied, or merely understood, should not stipulate a basic contract alone. * * *