**MASSMAN CONSTRUCTION COMPANY, Appellant.**

v.

**DIRECTOR OF REVENUE, STATE OF MISSOURI, Respondent.**

**No. 70636.**

Supreme Court of Missouri,
En Banc.

Feb. 14, 1989.

Rehearing Denied March 14, 1989.

Arnold R. Day, Sylvan Siegler, Kansas City, for appellant.

William L. Webster, Atty. Gen., Richard L. Wieler, Asst. Atty. Gen., Jefferson City, for respondent.

J. Michael Dryton, Glenn A. Jewell, Kansas City, for amicus curiae, Federated Securities Corp.

BLACKMAR, Judge.

The appellant taxpayer, Massman Construction Company, is so fortunate as to regularly have large balances in its checking accounts for which it has no immediate need. It understandably wants to obtain the best available return on these sums, even though its needs may preclude durable commitments. During the year 1981 it entered into arrangements with two of its depository banks, Commerce Bank of Kansas City N.A. and Security National Bank of Kansas City, Kansas, by means of which it would receive the interest derived from government bonds then owned by the banks. On every business day its treasurer or comptroller would call each of the banks to report the amount of cash available for short term investment. The bank would then issue, simultaneously, a confirmation of the immediate purchase by the taxpayer of government bonds and a confirmation of the resale of these same bonds by the taxpayer to the bank, usually effective the next business day.

The bonds did not exist in tangible form, but rather were shown on the books of the Federal Reserve Bank of Kansas City as being held for the Commerce and Security Banks. No entries were made on the books of the Federal Reserve evidencing the taxpayer's interest in the securities.

Interest and principal on the bonds were paid directly to the owner banks by the federal government. The return for the period of the taxpayer's "ownership" was computed for each transaction based on the prevailing market rate for short term investments. This interest rate was related to the yield quoted for government securi-

ties, but was not related to the coupon rate on the tinderlying securities. The taxpayer's entitlement is reflected in the difference between the "purchase price" and the "selling price" as shown on the confirmation form, and of course ultimately found its way to the taxpayer's bank account. Arrangements of this type are not uncommon in financial circles, and are known as repurchase agreements, or REPOS.[1]

The taxpayer claims that it is the owner of the bonds from the time of purchase until mandatory resale and that its monetary return consists of interest on obligations of the United States government, which is exempt from state income taxes by reason of the federal constitution and statutes, as recognized by the Missouri income tax statutes. It filed its 1981 state income tax return on this theory.[2] The director of revenue assessed a deficiency which the taxpayer challenged before the Administrative Hearing Commission. The commission denied the relief sought, finding in effect that the taxpayer had lent money to the banks and that the bonds stood as security for these loans. We conclude that the decision is legally correct and affirm it.

The exemption of obligations of the United States has constitutional origins, but its scope is expressed in 31 U.S.C. Sec. 3124, reading as follows:

(a) Stocks and obligations of the United States Government are exempt from

taxation by a State or political subdivision of a State. The exemption applies to each form of taxation that would require the obligation, the interest on the obligation, or both, to be considered in computing a tax,....

The state law does not fight with the federal, but rather expressly recognizes it, in the following provision (Sec. 143.121.3, RSMo 1986):

There shall be subtracted from his federal adjusted gross income the following amounts to the extent included in federal adjusted gross income:

(a) Interest or dividends on obligations of the United States and its territories and possessions or of any authority, commission or instrumentality of the United States to the extent exempt from Missouri income taxes under the laws of the United States....

If the taxpayer has received "interest or dividends on obligations of the United States ..." it is entitled to exclude these from the income shown on its Missouri tax return. Otherwise the deficiency was correctly assessed and the taxpayer's petition for review is without merit. The parties have cited us to numerous REPO cases. Some hold that the purchaser becomes the owner of the underlying securities, at least for certain purposes.[3] Others hold that the stated transaction is essentially a collateralized loan, and that the ownership of the securities is not changed.[4] The cases con-

1. The mechanics of REPO transactions and the economic considerations thereof are well documented in *Matter of Bevill, Brester & Schulman Asset*, 67 B.R. 557, 566–71 (D.N.J.1986). See also, Note, Lifting the Cloud of Uncertainty Over the Repo Market: Characterization of Repos as Separate Purchases and Sales of Securities, 37 Vand.L.Rev. 401, 402–03 (1984).

2. In 1981 the transactions were evidenced only by confirmation slips, which existed in several different versions. We consider the confirmation forms most favorable to the taxpayer's theory. We give no consideration to more elaborate contracts adopted in 1981, because they are wholly immaterial to this litigation.

3. *Citizens Nat'l Bank of Waco v. United States*, 551 F.2d 832, 213 Ct.Cl. 236 (1977); *Bank of California v. Commissioner of Internal Revenue*, 30 B.T.A. 556 [1934 WL 268] aff'd 80 F.2d 389

(9th Cir.1935) (income tax cases); *Matter of Bevill, Bresler & Schulman Asset*, 67 B.R. 557 (D.N.J.1986); *Gilmore v. State Bd. of Admin.*, 382 So.2d 861 (Fla.1980) (bankruptcy proceedings); *Bache Halsey Stuart Shields, Inc. v. University of Houston*, 638 S.W.2d 920 (Tex.App. 1982) (REPO not debt under state constitution).

4. *American Nat'l Bank of Austin v. United States*, 421 F.2d 442 (5th Cir.), cert. denied, 400 U.S. 819, 91 S.Ct. 36, 27 L.Ed.2d 46 (1970); *Union Planters Nat'l Bank of Memphis v. United States*, 426 F.2d 115 (6th Cir.), cert. denied, 400 U.S. 827, 91 S.Ct. 53, 27 L.Ed.2d 56 (1970); *First American Nat'l Bank of Nashville v. United States*, 467 F.2d 1098 (6th Cir.1972); *Capital Preservation Fund, Inc. v. Wisconsin Dept. of Revenue*, 145 Wis.2d 841, 429 N.W.2d 551 (1988); *Andras v. Illinois Dept. of Revenue*, 154 Ill.App.3d 37, 106 Ill.Dec. 732, 506 N.E.2d 439 (1987) (all income tax cases).

strue different contract transactions, for varying legal purposes. We have had to resort to them, but find it most satisfactory to analyze the transactions now before us and to assess their legal significance by our own standards. Having done this, we hold that the taxpayer did not receive "interest or dividends on obligations of the United States government," by reason of the REPO transactions. It rather received compensation from the bank for money paid to the bank out of its checking account. We believe that our conclusion is consistent with the weight of the applicable and pertinent authorities.

The director points out that the taxpayer never has physical possession of the securities. These remain on the books of the Federal Reserve Bank. After the taxpayer has "resold" them, there is no change in this bookkeeping entry. The securities are again available to the bank for a REPO transaction, with this taxpayer or others, or for outright sale by the banks without agreement to repurchase, or for whatever other use the banks may choose to make of them. The absence of physical delivery of the securities may not be the definitive circumstance, but it is an item to be considered in our evaluation.[5]

More persuasive is the circumstance that the bank, rather than the taxpayer, bears the risk of market fluctuations. The taxpayer's rights are fixed at the time of the opening transaction, which specifies both a purchase price and a higher repurchase price. The difference between the two figures represents the taxpayer's return on the transaction. The confirmation slips bear notations of the percentage of return and the taxpayer is entitled to that amount upon resale to the bank. While substantial market fluctuations are unlikely for the short time for which each particular REPO transaction is open, no possible fluctuation could affect the amount that the taxpayer is entitled to as shown by the confirmation of repurchase slips.

The banks, by contrast, stand to gain or lose by the daily changes in market price.[6] We believe the risk of market fluctuations is the prime incident of ownership of securities. Under the facts of this case, that risk was borne by the banks and not by the taxpayer.

The taxpayer's contractual obligation to resell the securities to the banks is also indicative of a collateralized loan. True ownership of securities is indicated by the owner's ability to sell to third parties. *Citizen's Nat'l Bank of Waco*, 551 F.2d 832, at 842, 213 Ct.Cl. 236 (1977). Counsel for the taxpayer admits the taxpayer could not effectively sell its interest to anyone other than the banks. Any "sale" would be subject to the already confirmed repurchase. The taxpayer's inability to transfer its interest to third parties is further evidenced by REPO documentation stating that the taxpayer's power to "exercise all rights of ownership including the right to sell the securities" was contingent upon the bank's default in failing to repurchase or failure to transfer additional securities in the event of market value decline of presently "owned" securities.

The record does not demonstrate the advantage to the banks in furthering these transactions, but we assume that their purposes are not eleemosynary. Each bank maintains inventories of government bonds and notes, and so the taxpayer's funds assist it in maintaining this inventory. The bank is also relieved of any liability or burden on account of the taxpayer's de-

---

**5.** We also note that the banks had a contractual right to substitute other securities for those described in the confirmation statement. While the mechanics of any such attempt are hard to fathom because simultaneous purchase and sale confirmations are issued, the contract provision indicates that the taxpayer never "owned" any specific securities.

**6.** Under the terms of the REPO agreements, the banks were obligated to add more securities to the transaction in the event the market value of those securities already purchased fell significantly prior to repurchase by the bank. This provision appears to be phantom as applied to the transactions in evidence, because the bank fully performs its obligation by crediting the resale price to the taxpayer's account, but the obligation to add securities is surely inconsistent with a claim that the taxpayer bears the risk of market fluctuation.

mand deposits, for the duration of the REPO transaction.

The taxpayer argues about the risk of the bank's insolvency. It is difficult to see that this is a significant question. Let us assume that a REPO transaction is to be consummated on a Friday, with the resale to take place the following Monday, and that on Saturday the bank's insolvency is established. By the taxpayer's theory the bonds would belong to it and so would be protected from claims of the bank's liquidator or creditors. By the director's theory, the taxpayer would seem to have a security interest in the bonds. For these reasons we do not find further speculation about the situation in the event of insolvency helpful.

The taxpayer points to the bank's rights against the taxpayer, under the contract between them, if the latter refuses to go through with its obligation to purchase or, having purchased, refuses to resell. These are phantom provisions. At the inception of the transaction the bank debits the taxpayer's account and issues a confirmation stating that it has done so. When the time for repurchase arrives the purchase price is credited to the taxpayer's account, in accordance with the resale confirmation issued at the time of purchase. The taxpayer has no opportunity to default at either end of the transaction.

The taxpayer argues, finally, that the parties have the right to cast the transactions in any form they choose, and that the director is bound by their choice of a transaction form in which the taxpayer becomes the owner of the securities. We always reserve the right to characterize the substance of transactions without regard to their form, when precise distinctions are legally significant. The paper trail is not conclusive. We conclude, from the totality of the evidence, that the taxpayer did not become the owner of the securities and did not receive interest on obligations of the United States during the period in issue.

We limit our holding to the facts of this record. We do not hold that a person may not become the owner of securities unless there is a transfer of possession. Nor do we hold that a number of owners may not hold securities as tenants in common, or that shareholders in a mutual fund, who bear the risk of market fluctuations, may not enjoy the tax benefits of the underlying securities. What we do hold is that this taxpayer received only a payment from the banks for their use of the taxpayer's money, rather than interest on the underlying obligations.

The decision of the Administrative Hearing Commission is affirmed.

BILLINGS, C.J., and ROBERTSON, RENDLEN, HIGGINS and COVINGTON, JJ., concur.

WELLIVER, J., dissents in separate opinion filed.

WELLIVER, Judge, dissenting.

I respectfully dissent. The Court's majority opinion removes an attractive business device from those businessmen who choose to do business in Missouri.

The reason for the loss of this attractive investment device is the uncertainty surrounding the nature of a repurchase agreement. (Repo). As the majority's opinion points out, the cases are all over the place on the question of whether the Repo is a sale, or merely a loan. Granted, the Repo agreement contains elements of both secured loans and outright sales. For the following reasons, I would hold that the Repo agreement constitutes a sale, and subsequent agreement to resell, the underlying Federal obligation, thereby exempting the interest income from state taxation.

First, the U.S. Supreme Court has noted the *broad* exemption contained in 31 U.S.C. § 3124. *American Bank & Trust Co. v. Dallas County*, 463 U.S. 855, 103 S.Ct. 3369, 77 L.Ed.2d 1072, reh'g denied, 463 U.S. 1250, 104 S.Ct. 39, 77 L.Ed.2d 1457 (1983), *Memphis Bank & Trust Co. v. Garner*, 459 U.S. 392, 103 S.Ct. 692, 693–94, 74 L.Ed.2d 562 (1983) (emphasis added). Section 3124, effective Sept. 13, 1982, Pub.L. 97–258, § 1, 96 Stat. 945. Earlier versions of this statute had been amended in 1959 to read: "This exemption extends to every form of taxation that would require that

either the obligations or the interest thereon, or both, be considered, directly or indirectly, in the computation of the tax, with certain exceptions not relevant here." Pub.L. 86–346, § 105(a), 73 Stat. 622, 31 U.S.C. § 742 (1976 ed.). This section, as amended, provided a "sweeping" exemption for federal obligations. *First Nat. Bank of Atlanta v. Bartow County Bd.*, 470 U.S. 583, 105 S.Ct. 1516, 1519, 84 L.Ed. 2d 535 (1985) *citing American Bank, supra.*

Second, the U.S. Supreme Court has held that a pledge of stock to a bank for a loan is an "offer or sale" for purposes of the Securities Act of 1933. *Rubin v. United States*, 449 U.S. 424, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981). In *Rubin*, the petitioner was convicted of making false representations to a bank concerning shares of stock pledged as collateral for loans. The stock was worthless, and petitioner subsequently defaulted on the loan. The bank sued on the note. Petitioner was convicted of fraud in the "offer or sale" of securities. Petitioner argued the pledges of stock to the bank did not constitute an "offer or sale" under the Securities Act of 1933. He further argued "the implied power to dispose of the stocks could ripen into title and thereby constitute a 'sale' only by effecting foreclosure of the various pledges, an event that could not occur without a default on the loans". *Id.* The Court held the pledge of the securities did constitute a disposition of an interest in a security, for value. *Rubin* could be read to suggest the bank's use of the underlying federal obligation as a form of collateral was also a transfer of an interest in a security. Given the broad exemption of federal obligations from state taxation, I would question whether income derived from this collateralized interest in the security could be taxed by the states.

Third, many cases cited by the majority differ from the present case. While the majority professes to use our "own" standards, it nevertheless adopts the reasoning contained in those cases. I believe this reasoning to be flawed. *American Nat'l Bank of Austin v. United States*, 421 F.2d 442 (5th Cir.) cert. denied, 400 U.S. 819, 91 S.Ct. 36, 27 L.Ed.2d 46 (1970), *Union Planters Nat'l Bank of Memphis v. United States*, 426 F.2d 115 (6th Cir.), cert. denied 400 U.S. 827, 91 S.Ct. 53, 27 L.Ed.2d 56 (1970), and *First American Nat'l Bank of Nashville v. United States*, 467 F.2d 1098 (6th Cir.1972) all involved municipal bond financing. While there were repurchase agreements present in those cases, the actual workings of the agreements were very different from the present case. Another distinguishing characteristic of those cases was the tax to be avoided was federal, not state, indicating a different standard of review at work.

A central theme of *American Nat'l Bank* was the lack of supposed market risk to the plaintiff. *Id*, at 452. The court discounted the possibility of a successful bidder-dealer being financially unable to take the bonds from the plaintiff. *Id*, at 453. In *American Nat'l Bank of Austin v. United States*, 573 F.2d 1201 (1978), the Court of Claims questioned the underlying "no risk" rationale of the earlier *American Nat'l Bank* after evidence showed six bond dealers in the latter case did, in fact, decline to exercise their options, causing the plaintiff to sustain a large financial loss. The chances of default are no smaller for Repo agreements involving underlying federal obligations, as the Mount Pleasant Bank and Trust Company, a small Iowa bank, Lombard Wall, Inc., a government securities dealer, and the Fidelity Savings and Loan Association of San Francisco all demonstrate. Each failed, each involved various amounts of Repo agreements, and each demonstrated that the risk of loss could ultimately rest on the purchaser of the Repo. I do not see the dispositive importance the risk of market fluctuation would play in a situation like the present case, especially when such short time periods, mostly overnight, are involved. The short time spans, and hence great liquidity, involved in these types of agreements are an element of their popularity.

Fourth, I see no relevance in whether physical delivery of the underlying security has occurred. Since 1965, the Federal Reserve Banks and the Department of the

Treasury have tried to eliminate the paper evidencing Treasury obligations, favoring instead a computer entry system. *See* Hoey and Rassnick, "Automation of Government Securities Operations", 17 Jurimetrics Journal 176 (1976). Non-possessory Repo transactions also involve less cost to the purchaser since he avoids the usual transfer fee for actual physical delivery. *In re Bevill,* 67 B.R. 557, 570 (D.N.J.1986).

Fifth, the Securities and Exchange Commission has issued policy statements treating Repurchase agreements as "short term contracts to sell and repurchase entire government securities in large denominations". 46 Fed.Reg. 48,637 (1981) (reprinting SEC Exchange Release No. 34–18122 (1981)). The release also shows the differing types of Repo agreements, for instance "wholesale" or "retail",[1] which was not discussed in the record. The record does contain the testimony of Mr. Omar Whitesell, Treasurer of Massman Construction, who testified he had been entering Repo agreements on behalf of the company with the banks involved in this case since approximately 1977. The Governors of the Federal Reserve Board, the Federal Deposit Insurance Corporation and the Federal Home Loan Bank Board only allowed banks and depository institutions to begin offering their customers "retail" Repo transactions in late 1979. Note, at 405. While the transactions here were in 1981, their classification as "wholesale" or "retail" remains unknown to us.

Finally, the Bankruptcy Code was amended in 1984 to provide protection to a Repo participant, who, upon the insolvency of the debtor, would have faced uncertain treatment depending on the classification of his interest in the underlying security. 11 U.S.C. § 559, effective Oct. 8, 1984, permits the Repo participant to liquidate the repurchase agreement with the debtor. This decision to liquidate cannot be stayed, avoided, or otherwise limited by any provision of the Bankruptcy Code or by order of a court or administrative agency, unless where the debtor is a stockbroker or securities clearing agency, the order is authorized by either the Securities Investor Protection Act of 1970 or any statute administered by the SEC. This revision allowing liquidation of a Repo position would seem to suggest a desire to treat the repurchase transactions as actual sales, thereby removing the securities from both the estate of the debtor and the avoidance powers of the Trustee.

For the above reasons, I respectfully dissent.

---

1. The differences between the two can be seen in Note, "Lifting the Cloud of Uncertainty Over the Repo Market: Characterization of Repos as Separate Purchases and Sales of Securities", 37 Vand.L.Rev. 401, 403–05 (1984), [hereafter referred to as Note].