## FIRST NAT. BANK IN WICHITA v. COMMISSIONER OF INTERNAL REVENUE. *
### No. 434.

Circuit Court of Appeals, Tenth Circuit.
March 28, 1932.

*Rehearing denied May 14, 1932.

Phil D. Morelock, of Kansas City, Mo. (Dudley Doolittle and Perry W. Shrader, both of Kansas City, Mo., on the brief), for petitioner.

Morton K. Rothschild, Sp. Asst. to Atty. Gen. (G. A. Youngquist, Asst. Atty. Gen., Sewall Key, Sp. Asst. to Atty. Gen., and C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and Philip M. Clark, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., on the brief), for respondent.

Before LEWIS and COTTERAL, Circuit Judges, and KENNAMER, District Judge.

LEWIS, Circuit Judge.

During the latter part of the year 1922 and continuously thereafter throughout the years here involved (1922–1927 inclusive) petitioner held a large amount of tax exempt municipal bonds. It complains that "The respondent has included in the taxable income of the petitioner nontaxable interest received from obligations of states and political subdivisions thereof owned by the petitioner * * * which have been added to the income of the petitioner by the respondent" and "should be eliminated from said income in accordance with the statute. * * * *" There is no doubt of the exemption from income taxes of the interest on these securities in favor of the person or persons who were entitled to receive it and did receive it. So, the issue is one of fact.

The facts found by the Board and sustained by the proof are in substance these: Brown-Crummer Company are large dealers in municipal bonds at Wichita, and they needed at times a million or more dollars from outside sources in their business; during the years here involved it procured from petitioner between five and six million dollars in the manner hereinafter stated; prior to November, 1922, when they desired funds from the petitioner they would deliver to petitioner bonds and receive from petitioner the amount agreed upon, giving to petitioner at the time this written statement:

"First National Bank,
"Gentlemen: We hand you herewith ―――― Bonds Nos. ――― for ――― each. Please credit our account with the face value of these bonds, $―――, said bonds to be held by you for our account and to be taken up at any time on your or our demand at par and

accrued interest from this date, at bond rate, ———%.

"Very truly yours,
"Brown-Crummer Company,
"By ————."

The comptroller appears to have objected to this written statement of the transaction, apparently on the ground that it was a mortgage and the amount a loan, the face value of bonds held by the bank in this way being found to greatly exceed the amount which the bank was authorized to loan to any one person or firm. Conferences were then held by an officer of the bank with the comptroller, and this form of agreement was agreed upon as obviating the objection.

"This agreement by and between ——— and the First National Bank in Wichita, Kansas, chartered under the laws of the United States of America.

"Witnesseth, that whereas the said ——— has this day sold to the First National Bank in Wichita the following described bonds, namely ——— receipt of which is hereby acknowledged, in consideration of the purchase price of $——— the receipt of which is hereby acknowledged, the said ——— does hereby agree to reimburse said bank for any loss said bank may suffer when at its option it shall sell said bonds, or when said bonds are matured, and shall for any reason not be paid by the makers thereof; provided, however, the said ——— shall be entitled to 30 days notice of the bank's intention to sell said bonds, provided further that said ——— shall have the privilege of purchasing said bonds from said bank upon the payment of $——— and interest at ——— from ——— until paid.

"In Testimony Whereof the said bank and said ——— have caused these presents to be signed this ——— day of ——— 192—."

The comptroller in his letter approving this agreement said:

"The copy of the agreement between the Brown-Crummer Company and your bank.is also received, under which the company agrees to sell to your bank certain bonds and to reimburse the bank for any loss suffered by it in the event it shall dispose of the bonds, or at their maturity, but with the understanding that the Brown-Crummer Company shall have the privilege of purchasing such securities so sold to the bank upon the payment of the principal and interest. This agreement is satisfactory, inasmuch as the Brown-Crummer Company merely has the privilege of repurchasing the bonds referred to, and does not bind itself absolutely so to do. If the

Brown-Crummer Company could be compelled to repurchase these bonds, the transaction would then be a loan subject to the limit prescribed by Section 5200, U. S. R. S."

After this approval by the comptroller, the transactions between the bank and Brown-Crummer Company continued, and as bonds were delivered to the bank Brown-Crummer Company received credit to its account. The approved written agreement accompanied these transactions and others of like character with other bond brokers, and the bank entered the bonds on its books as a part of its assets. But Brown-Crummer Company continued to carry the bonds so delivered on its books as its assets, and showed the amount obtained thereon from the bank as a loan payable. Except in special instances on account of the character and amount of the bonds, Brown-Crummer Company were given the privilege of substituting other bonds in place of those then held by the bank, and when substitutions were made Brown-Crummer Company delivered to the bank this written statement:

"First National Bank, Wichita, Kansas.

"Dear Sirs: We are handing you herewith the following described securities: ——— which we desire to exchange for securities which you are now holding for our account, and therefore would thank you to deliver to bearer the following securities ——— receipt of which is hereby acknowledged.

"The Brown-Crummer Company,
"By ———.
"Date ———."

Exchanges were frequently made, sometimes several times a day, and were requested and usually consented to when Brown-Crummer Company sold some of the deposited bonds or had occasion to otherwise use them. The same arrangement and procedure was had between the bank and other dealers in bonds, but of the total amounts handled during the years in question, 80 to 90 per cent. were in transactions with Brown-Crummer Company. Interest accruing on the bonds was represented by attached coupons due semiannually. When they came due, the bank would clip them, and deliver them to Brown-Crummer Company. By agreement between the parties at the time the bonds were delivered to the bank, and by uniform course of dealing, a rate of interest was agreed upon on the amounts the bank credited Brown-Crummer Company, and the latter paid the bank this interest monthly. In some instanc-

es the interest paid by Brown-Crummer Company on the amount placed to its credit, when the bonds were delivered, was at the same rate as that named in the bonds, but was payable monthly and not at the times interest fell due on the bonds. In some instances the interest paid by Brown-Crummer Company was at a higher rate than that on the bonds, and in other instances a lesser rate. On the whole during the years in question Brown-Crummer Company paid the bank less interest than it received on the bonds. None of these bonds were ever sold by the bank unless it can be said that those taken up by substituting other bonds on the part of Brown-Crummer Company, or the payment in cash of the amount that had been received on them by it were sales to Brown-Crummer Company. As instances of a less rate of interest charged by the bank and paid by Brown-Crummer Company than that borne by the bonds an exhibit shows these: $360,000 Bartlesville, Oklahoma, bonds bore 5%, the bank collected 4% from Brown-Crummer Company; $1,520,000 Hidalgo County, Texas, bonds bore 6%, the bank collected 4% from Brown-Crummer Company; $628,000 Tulsa, Oklahoma, bonds bore 5%, the bank collected 4% from Brown-Crummer Company; $100,000 Sutter County, California, bonds bore 7%, the bank charged and collected 5% from Brown-Crummer Company. On United States Liberty Bonds bearing 4¼% of comparatively small amounts, the bank collected 6%.

It is contended that the written contract made by the parties when the bonds were delivered passed legal title to the bonds in the bank, and by force thereof interest on them was the bank's property. There is no doubt that the form of contract might have been carried out in that way, but the blanks in the contract submitted to the comptroller left an opportunity to the bank of which it availed itself, and the practice as carried on by the parties clearly shows that it was never intended that the bank should be entitled to the interest accruing on the bonds. Conceding that under the contract the legal title to the bonds was in the bank, the uniform conduct and practice of the parties was a joint admission that the interest coupons and their proceeds when collected did not belong to the bank, but were the property of Brown-Crummer Company. They were collected by Brown-Crummer Company and applied to its use and benefit. When the coupons were detached from the bonds by the bank and delivered to Brown-Crummer Company, the interest represented by them "was no longer a mere incident of the principal indebtedness represented by the bond," and the coupons became independent obligations, separate and apart from the bonds. Edwards v. Bates County, 163 U. S. 269, 272, 16 S. Ct. 967, 41 L. Ed. 155; Nesbit v. Riverside Independent District, 144 U. S. 610, 12 S. Ct. 746, 36 L. Ed. 562. The bank got none of the interest that accrued on the bonds. It was not entitled to it. Brown-Crummer Company paid the bank all its interest charges. The Board of Tax Appeals held that these interest charges received by the bank from Brown-Crummer Company should be included in the bank's taxable income.

Affirmed.