541 So.2d 1270 (1989)
DEPARTMENT OF REVENUE, STATE OF FLORIDA, Appellant,
v.
James F. PAGE, et al., Appellees.
No. 87-2390.
District Court of Appeal of Florida, Fifth District.
Opinion filed March 23, 1989.
Rehearing Denied April 26, 1989.
Robert W. Butterworth, Atty. Gen. and Daniel C. Brown, Asst. Atty. Gen., Tallahassee, for appellant.
James F. Page of Gray, Harris & Robinson, P.A., Orlando, for appellees.
DANIEL, Judge.
The Department of Revenue of the State of Florida (DOR) appeals a final judgment which held Florida's intangible tax unconstitutional as applied to shares of the Trust for Short Term U.S. Government Securities (Trust) owned by James and Elizabeth Page and ordered a refund of the taxes paid by the Pages. The question on appeal is whether 31 U.S.C. § 3124 and section 199.185(1)(d), Florida Statutes (1985) which provide that obligations of the United States government are exempt from taxation preclude Florida from imposing its intangible tax on the portion of the Pages' shares of the Trust represented by the Trust's holdings in repurchase agreements for federal securities. We conclude that such exemption does not apply and accordingly we reverse.
The record reflects that in November 1986, the Pages purchased 75,620.56 shares of the Trust at a price of $1.00 each. The *1271 Trust is a no-load, open-end, diversified investment company whose primary objective is to receive current income from its investments in U.S. government securities and obligations. It does not engage in any other business. The Trust, which is principally located in Pittsburgh, Pennsylvania, is organized as a Massachusetts business trust, is qualified as a regulated investment company under Internal Revenue Code Subchapter M, and is established under the Investment Company Act of 1940. It is commonly known as a "mutual fund." A mutual fund is merely a conduit for passing the income of the fund's portfolio of securities through to its shareholders.
In filing their annual Florida intangible tax return for the 1987 calendar year, the Pages included, among other things, their shares in the Trust, listing their value at $75,620.56. The Pages paid DOR the amount of tax which was not being contested and paid into the registry of the court[1] the amount of $60.26 attributable to the contested intangible tax for their ownership of shares in the Trust.
At trial, counsel for the Pages represented that the Trust invests in government securities by purchasing them directly and through "repurchase" agreements. A standard repurchase agreement consists of a two part transaction. The first part involves the transfer of specified securities by the "seller" to the "buyer" for cash. The second part consists of the contemporaneous agreement by the seller to repurchase the securities at the original price plus an agreed upon amount of interest at a specified date in the future. The parties agreed that if the repurchase agreements were viewed as the purchase and sale of government securities, then the transaction would be exempt from Florida intangible tax. If, however, the transactions were viewed merely as loans with government securities as collateral, then they would be subject to tax. Thus the sole question for the trial court was the true nature of the repurchase agreements.
The Pages called Eugene Maloney, corporate counsel for Federated Investors, Inc., which created the Trust. Maloney testified that the Trust is not taxed as an entity and any tax consequences of its investments are passed to its shareholders, that the Trust invests in government securities with a maturity of one year or less, and that Government obligations pay a lower rate of interest than comparable obligations and are able to compete in the market place because the federal government is considered to have superior creditworthiness and because the obligations are free from personal income and intangible taxes.
Maloney further testified that a repurchase agreement by definition is the simultaneous purchase and agreement to resell United States Government securities, that the Trust uses repurchase agreements to liquefy a portion of its portfolio in order to be able to pay its shareholders the proceeds on their investments, and that the Trust intended that the transaction be treated as a purchase and sale and used that methodology in acquiring those securities. Maloney also noted that the repurchase agreement provided for the seller to sell the securities to the Trust subject to an agreement to repurchase the securities at a later date for an amount plus interest, that the Trust has the right to immediately sell the securities if the seller were to default, and that there is no promissory note executed in connection with the repurchase agreement. According to Maloney, the Trust does not have the right to trade the securities during the term of the repurchase agreement.
On cross examination, Maloney stated that the Trust is prohibited from trading or alienating the securities unless there is a default by the seller, that the Trust is contractually bound to give the interest earned on the securities back to the seller, that if the securities fall in value, the seller is obligated to deliver additional securities to protect the Trust, that the Trust's income from the repurchase agreement is the interest paid by the seller and there is no correlation between the interest rate on the government securities and the interest *1272 earned by the Trust, that the repurchase agreement allows the seller to substitute eligible securities and that the Trust enters into repurchase agreements only with creditworthy brokers or dealers to insure that the securities will be repurchased at maturity.
The Pages also introduced the deposition testimony of Peter Sternlight, the executive vice president of the Federal Reserve Bank of New York. Sternlight stated that repurchase agreements involving United States Treasury issues and other agency issues are essential to the efficient functioning of the government securities' markets. Sternlight noted that repurchase agreements are unique vehicles for short term high volume financing and, as used in the market today, are viewed as contracts for the sale of securities and the resale back to the original seller at a future date. He also testified that an essential feature of this arrangement is that securities delivered under a repurchase agreement are freely transferrable and unencumbered by restriction from previous transfers.
On cross examination, Sternlight stated that the function of the Federal Reserve was to make adjustments in the nation's money supply, sometimes on a short term and quick basis, and it would be more difficult to make those short term adjustments without repurchase agreements. Sternlight admitted that the Federal Reserve would not be allowed to use repurchase agreements if they were characterized as secured loans. Sternlight also admitted that from the standpoint of its economic function, a repurchase agreement was very close to a collateralized loan.
DOR called Stewart Brown, a financial analyst and university professor, who testified that from an economic perspective, repurchase agreements are collateralized loans and that, in this particular case, the Trust would be the lender, the seller would be the borrower and the loan would be secured by government securities. Brown based his conclusion on the fact that a buyer could simply purchase securities outright, the interest rate on the agreement is different from the interest rate on the underlying securities which reflects that there is a credit risk to the buyer, the seller can freely substitute securities, and the buyer does not earn any interest on the underlying securities but rather makes its money on the interest paid by the seller. Brown also noted that the securities held by the Trust under repurchase agreements were long term securities which the fund would not normally purchase and that the Trust was concerned about the creditworthiness of the seller which further indicated that the transactions were loans.
The trial court's conclusion that the repurchase agreement used by the Trust in this case was a purchase and sale was based on policy reasons, the intent of the parties, and the conclusions reached in other cases. The court held that the statute imposing Florida's intangible tax was therefore unconstitutional as applied to the Pages' shares in the Trust and the Pages were entitled to a refund of their taxes.
Section 199.032, Florida Statutes (1985) imposes an annual tax of one mill on each dollar of the just valuation of all intangible personal property, except for notes, bonds, and other obligations for the payment of money which are secured by mortgage, deed of trust, or other lien upon real property situated in the state. Section 199.023(1) defines "intangible personal property" as all personal property which is not in itself intrinsically valuable, but which derives its chief value from that which it represents, including, but not limited to, the following:
(a) All stocks or shares of incorporated or unincorporated companies, business trusts, and mutual funds.
(b) All notes, bonds, and other obligations for the payment of money.
Section 199.185(1) provides that the following intangible personal property shall be exempt from taxation:
(d) Notes, bonds, and other obligations issued by the State of Florida or its municipalities, counties, and other taxing districts, or by the United States Government and its agencies.
31 U.S.C. § 3124 provides as follows:

*1273 Exemption from taxation
(a) Stocks and obligations of the United States Government are exempt from taxation by a State or political subdivision of a State. The exemption applies to each form of taxation that would require the obligation, the interest on the obligation, or both, to be considered in computing a tax, except 
(1) a nondiscriminatory franchise tax or another nonproperty tax instead of a franchise tax, imposed on a corporation; and
(2) an estate or inheritance tax.
The court below concluded that the Pages' shares in the Trust are not subject to taxation because the Trust is the owner of the government securities involved in the repurchase agreements (repos). The court rejected DOR's contention that the repos are loans by the Trust to brokers and dealers which are merely secured by government obligations and therefore are not exempt from taxation.
In so holding, the trial court relied primarily on In the Matter of Bevill, Bresler and Schulman Asset Management Corporation, 67 B.R. 557 (D.N.J. 1986). Although the Bevill case involved numerous issues, the critical inquiry was whether the repos and reverse repos[2] were properly characterized as purchases and sales or as secured loan transactions.
The court acknowledged that repos and reverse repos are hybrid transactions which do not fit neatly into either a secured loan or purchase and sale classification and that they have functional attributes of both types of transactions. The court held that the intent of the parties viewed in the context of the entire market was the controlling consideration and concluded that the mere presence of secured loan characteristics was not enough to negate the parties' decision to structure the transactions as purchases and sales.
On appeal, DOR argues that the property law concepts used in Bevill are not controlling in a tax case such as this. Interestingly, the court in Bevill rejected the tax cases cited by proponents of the "secured loan" characterization because there the courts were concerned with the tax avoidance possibilities associated with the transactions and focused their attention solely on their economic substance. More importantly, however, we find that the repos in Bevill differ significantly from the repos in this case. In Bevill, the court noted that generally there were no restrictions on the purchaser's right to transfer or encumber the securities subject only to the contractual obligation to return the same security on the closing date of the transaction. In the present case, Eugene Maloney testified that the Trust is prohibited from trading or alienating the securities unless there is a default by the seller. The general repurchase agreement in the record on appeal provides that the Trust will not resell or reregister the securities except upon default by the seller.
In several tax cases involving repo transactions, the courts have concluded that the parties' subjective intent is not controlling but rather the tax exemption was available only to the true owner, that is, the party who stands to gain or lose as the federal securities trade in the marketplace. For example, in Andras v. Illinois Department of Revenue, 154 Ill. App.3d 37, 106 Ill.Dec. 732, 506 N.E.2d 439 (1987), cert. denied, ___ U.S. ___, 108 S.Ct. 1223, 99 L.Ed.2d 424 (1988), the issue was whether certain repurchase agreements involving government securities were in fact loans by a mutual fund and therefore the interest earned was not tax exempt. In that case, the fund agreed to purchase certain government securities from a bank or other seller and simultaneously agreed to resell the same securities to the same party on a certain, fixed date, which was generally in a few days of the original sale date. The seller agreed to pay interest to the fund at a fixed rate for the period between the original sale and the repurchase. Some of the representative repurchase agreements *1274 in the record referred to the original purchase price as "principal" and to the government securities as "collateral."
On appeal, the court held that the tax exemption was available only to the taxpayer who actually owned the securities, that is, the taxpayer who had the right to dispose of them and who bore the risk of a profit or loss. In determining whether the taxpayer owned the securities or whether the securities were merely collateral, the court considered the entire transaction and looked to the following as indicia of a loan:
1. Whether the seller could require the purchaser to resell the securities;
2. Whether the purchaser could require the seller to repurchase them;
3. Whether the agreement provides either party a specific remedy in the event that the other defaults;
4. Whether the seller agreed to pay interest at a stipulated rate between the sale and resale;
5. Whether the amount advanced does not necessarily equal the fair market value of the securities sold;
6. Whether the identical securities are bought and sold; and
7. Whether the purchaser may sell the security for the seller's account in the event of the default.
506 N.E.2d at 443-444, 106 Ill.Dec. at 736-737.
Applying these criteria, the Andras court concluded that the fund accepted none of the risks of ownership and therefore the transactions were secured loans rather than sales. The fund and the sellers agreed to a repurchase transaction involving the same securities at the time of the sale and either could therefore properly require the other to perform. And, although the agreements did not expressly provide mutual remedies in the event of a default, the fund was apparently authorized to sell the securities if the seller defaulted. There was no indication that a default sale would relieve the seller of the obligation to pay the agreed amount and such a default sale would only act as a credit against any amount still owed by the seller under the original agreement. In addition, the sample agreements clearly set a specific rate of interest. The Andras court also rejected an argument that public policy considerations require the interest from the transactions be considered tax exempt because the fund was unable to demonstrate that the impact would be so great as to cause investors to ignore the other advantages of federal securities, such as their great liquidity and safety.
In other cases in which the party holding legal title did not bear the risks of ownership, the courts have held that income from the repo transaction was subject to tax. See Union Planters National Bank of Memphis v. United States, 426 F.2d 115 (6th Cir.1970); American National Bank of Austin v. United States, 421 F.2d 442 (5th Cir.1970); Capital Preservation Fund v. Department of Revenue, 145 Wis.2d 841, 429 N.W.2d 551 (1988); In re Thomas C. Sawyer Estate, 546 A.2d 784 (Vt. 1987).
In contrast, the courts have held that income from repos was exempt from tax where the taxpayer had the rights and risks of ownership. For example, in Citizens National Bank of Waco v. United States, 551 F.2d 832 (Ct.Cl. 1977), the Court of Claims concluded that municipal bonds transferred to the Citizens National Bank of Waco from one of its customers, American Amicable Life Insurance Company, was a sale and not a collateralized loan and therefore the interest paid on the bonds while held by the bank was tax exempt. In that case, there was no date for American to repurchase the bonds, there was no provision for default if American did not buy the bonds, the bank did not account for interest to American, the bank had the right to sell the bonds to third parties and the bank was not required to resell the bonds to American, thus indicating that the bank was the true owner of the bonds. In American National Bank of Austin v. United States, 573 F.2d 1201 (Ct.Cl. 1978), the court held that coupon interest on bonds held by a bank under repo agreements with bond dealers was tax exempt. There the agreements were actually options for the bond dealers to repurchase, there was no legally enforceable obligation *1275 to repurchase, the bank bore the risk of ownership and in fact did suffer financial loss when several bond dealers declined to exercise their option to repurchase.
In the present case, the Trust does not have the risks or rights associated with ownership. The Trust must return the same securities to the sellers, it cannot resell or reregister the securities, it is protected from falling prices, its income is derived from a separate interest rate unrelated to the securities, it must return to the seller any excess proceeds if the securities are sold upon the seller's default and there is a specific date set for repurchase. We conclude, therefore, that the Trust is not the true owner of the federal securities under the repurchase agreements and, accordingly, the portion of the shares of the Trust attributable to repurchase agreements is not exempt from taxation.
REVERSED and REMANDED for entry of judgment consistent herewith.
ORFINGER and COBB, JJ., concur.
NOTES
[1] See § 72.011(3), Fla. Stat. (1985).
[2] A standard reverse repo consists of the same two-part transaction viewed from the perspective of the buyer. Thus, when one sells a security and agrees to buy it back he is engaged in a repo transaction. When the same party buys a security and agrees to sell it back, he is engaged in a reverse repo transaction. 67 B.R. at 567.