578 A.2d 192

**COMPTROLLER OF THE TREASURY, INCOME TAX DIVISION**

v.

**FIRST UNITED BANK & TRUST as Guardian for the Property for Dale W. Alexander.**

**No. 100, Sept. Term, 1988.**

Court of Appeals of Maryland.

Aug. 30, 1990.

John K. Barry, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Gerald Langbaum, Asst. Atty. Gen., all on brief), Annapolis, for appellant.

Harry D. Shapiro (Richard G. Solomon, Weinberg and Green, all on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS, and BLACKWELL *, JJ.

ELDRIDGE, Judge.

This Maryland income tax case involves a distribution to a shareholder made in 1985 by a money market mutual fund. The mutual fund's income from which the distribution was made was derived in two ways. One source (accounting for 53.55% of the income) was interest paid by the United States directly to the mutual fund as a holder of federal

---

* Blackwell, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Art. IV, § 3A, he also participated in the decision and the adoption of this opinion.

debt obligations. The other source of the distribution (accounting for 46.45% of the income) was income earned by the mutual fund in transactions known as repurchase agreements (repos) which involved United States government securities and which are hereafter described. The ultimate issue in this case is whether the distribution in the hands of a shareholder is exempt from state taxation, in whole or in part.

The mutual fund involved here is the Trust for Short-Term U.S. Government Securities, a Massachusetts business trust. It is a no load, open-end, regulated investment company, subject to the provisions of subchapter M of the Internal Revenue Code, 26 U.S.C. §§ 851–860G. The Trust's policy is to invest in United States government securities that mature in one year or less from the date of acquisition. The January 1985 prospectus of the Trust advised that it will also invest in repos, described therein as "arrangements in which banks, brokers, dealers, and other recognized financial institutions sell U.S. Government securities to the Trust and agree at the time of sale to repurchase them at a mutually agreed upon time and price within one year from the date of acquisition."

The appellee is a bank in Garrett County, First United Bank & Trust Co., in its capacity as guardian for the property of a minor, Dale W. Alexander (the Taxpayer). The Taxpayer held shares of beneficial interest in the Trust. The Trust distributed $798.90 in 1985 to the Taxpayer, on which $36 in income taxes were paid to Maryland. The Taxpayer claimed a refund of the $36.

This refund claim was denied by the appellant, the Comptroller of the Treasury of Maryland. The Taxpayer appealed to the Maryland Tax Court which held the entire distribution to be exempt from State income tax. On the Comptroller's appeal to the Circuit Court for Baltimore City, the Tax Court was affirmed. The Comptroller then appealed to the Court of Special Appeals but, prior to consideration by that court, we issued a writ of certiorari.

## I.

■ We address first the 53.55% portion of the Trust's 1985 distribution to the Taxpayer, derived from interest paid by the United States directly to the Trust as a holder of federal debt obligations.

The Taxpayer contends that this income is exempt from State income tax because of (1) the provisions of 31 U.S.C. § 3124(a) and (2) the treatment under Maryland law of a shareholder's beneficial interest in the assets of a Massachusetts business trust. The Comptroller argues that, under both federal and Maryland law, the Trust is treated as a corporation for tax purposes, that its distributions are dividends taxable to its shareholders, and that there is no statute which requires continued characterization of this income as interest on federal obligations once it is paid to the shareholders. Because we shall hold that this income is exempt from State taxation as a matter of federal law, under 31 U.S.C. § 3124(a), we need not address the Taxpayer's argument based on Maryland law.[1]

---

1. It is noteworthy that, by Ch. 545 of the Acts of 1989, the General Assembly amended the Maryland income tax laws to provide for a subtraction from federal adjusted gross income, under certain circumstances, of the distribution or dividend by a mutual fund of interest "attributable" to a U.S. government obligation. This statute became effective on July 1, 1989. Codified as Maryland Code (1988, 1989 Cumm.Supp.), § 10–207(c–1) of the Tax–General Article, the 1989 statute reads as follows:

   "(c–1) *Dividends or distribution by mutual funds.*—(1)(i) In this subsection, the following words have the meanings indicated.

   (ii) 'mutual fund' means a regulated investment company as defined under § 851 of the Internal Revenue Code.

   (iii) 'State tax exempt interest' means interest or dividends attributable to a United States government obligation.

   (iv) 'United States government obligation' means an obligation of the United States or an authority, commission, instrumentality, possession, or territory of the United States.

   (2) The subtraction [from Federal adjusted gross income] under subsection (a) of this section includes a distribution or dividend by a mutual fund of State tax exempt interest, provided that at least 50% of the interest received by the mutual fund during its taxable year is from United States government obligations."

The Taxpayer's federal income tax return for the calendar year 1985 included the $798.90 distribution from the Trust in the taxable income therein reported. The Public Debt Act of February 19, 1941, § 4(a), 55 Stat. 7, 8, codified in relevant part, as amended, at 31 U.S.C. § 3124(b), made interest on federal obligations thereafter authorized and issued, in general, fully taxable by the United States. *See* IRS Reg. §§ 1.61–7(b)(3) and 1.103–4(b).

The starting point for computing the Taxpayer's 1985 Maryland income tax liability was the Taxpayer's federal adjusted gross income for that year. *See* Maryland Code (1957, 1980 Repl.Vol.), Art. 81, § 280(a).[2] Pursuant to Art. 81, § 280(c)(1), interest on United States government obligations was subtracted from federal adjusted gross income in computing taxable income for the Maryland return.[3] While the Taxpayer did not receive interest payments directly from the United States, § 280(c)(1) acknowledged that the Taxpayer may subtract, from federal adjusted gross income, "any ... income to the extent includable in gross income for federal income tax purposes, but exempt from State income taxes under the laws of the United States."

Every court that has faced this issue has held that a distribution from a mutual fund to a shareholder, representing interest paid by the United States directly to the fund as

---

This statute has no bearing on the 1985 distribution considered in the instant case. Moreover, even if it did, to the extent there might exist a conflict between the Maryland and federal statutes, the federal statute, of course, would control.

**2.** Unless otherwise noted all references to Art. 81 are to Code (1957, 1980 Repl.Vol., 1985 Interim Supp.). Much of former Art. 81 was recodified as the Tax–General Article by Ch. 2 of the Acts of 1988.

**3.** Article 81, § 280(c)(1), read in relevant part as follows:
"(c) *Amounts to be subtracted from federal adjusted gross income.*— There shall be subtracted from federal adjusted gross income:
    (1) Interest or dividends on obligations of the United States ... and any other income to the extent includable in gross income for federal income tax purposes, but exempt from State income taxes under the laws of the United States...."

a holder of federal debt obligations, is exempt from state taxation under federal law. *See Brown v. Franchise Tax Bd.*, 197 Cal.App.3d 300, 242 Cal.Rptr. 810 (1987); *Andras v. Illinois Dept. of Revenue,* 154 Ill.App.3d 37, 106 Ill.Dec. 732, 506 N.E.2d 439 (1987), *cert. denied,* 485 U.S. 960, 108 S.Ct. 1223, 99 L.Ed.2d 424 (1988); *Matz v. Department of Treasury,* 155 Mich.App. 778, 401 N.W.2d 62 (1986); *Borg v. Dept. of Rev.,* 308 Or. 34, 774 P.2d 1099 (1989); *In re Thomas C. Sawyer Estate,* 149 Vt. 541, 546 A.2d 784 (1987); *Capital Preservation Fund v. Dept. of Rev.,* 145 Wis.2d 841, 429 N.W.2d 551 (Wis.App.1988).

The controlling statute is 31 U.S.C. § 3124(a), which provides as follows:

"(a) Stocks and obligations of the United States Government are exempt from taxation by a State or political subdivision of a State. The exemption applies to each form of taxation that would require the obligation, the interest on the obligation, or both, to be considered in computing a tax, except—

"(1) A nondiscriminatory franchise tax or another nonproperty tax instead of a. franchise tax, imposed on a corporation; and

"(2) An estate or inheritance tax."

In *American Bank and Trust Co. v. Dallas County,* 463 U.S. 855, 858, 103 S.Ct. 3369, 3372, 77 L.Ed.2d 1072 (1983), the Supreme Court summarized the status of the law prior to the 1959 amendments to what is now 31 U.S.C. § 3124:

"Until 1959, Rev.Stat. § 3701, 31 U.S.C. § 742, provided, in pertinent part, that '[a]ll stocks, bonds, Treasury notes, and other obligations of the United States, shall be exempt from taxation by or under State or municipal or local authority.' This Court consistently held that this language prohibited state taxes imposed *on* federal obligations, either directly, or indirectly as part of a tax on the taxpayer's total property or assets. See *Society for Savings v. Bowers,* 349 U.S. 143, 147–148 [75 S.Ct. 607, 609–610, 99 L.Ed. 950] (1955). The Court also consistently held, however, that § 3701 did not prohibit nondiscrimi-

natory taxes imposed on discrete property interests such as corporate shares or business franchises, even though the value of that discrete interest was measured by the underlying assets, including United States obligations. See *Werner Machine Co. v. Director of Taxation,* 350 U.S. 492, 493–494 [76 S.Ct. 534, 535–536, 100 L.Ed. 634] (1956); *Society for Savings v. Bowers,* 349 U.S., at 147–148 [75 S.Ct. at 609–610]; *Des Moines National Bank v. Fairweather,* 263 U.S. 103, 112 [44 S.Ct. 23, 26, 68 L.Ed. 191] (1923); *Home Savings Bank v. Des Moines,* 205 U.S. 503, 518–519 [27 S.Ct. 571, 575–576, 51 L.Ed. 901] (1907); *Provident Institution v. Massachusetts,* 6 Wall. 611, 629–632 [18 L.Ed. 907] (1868). Similarly, the Court interpreted Rev.Stat. § 3701 not to prohibit taxes imposed on a discrete transaction, such as an inheritance, even though the value of the inheritance was measured according to the value of the federal obligations transferred. *Plummer v. Coler,* 178 U.S. 115, 133–134 [20 S.Ct. 829, 836–837, 44 L.Ed. 998] (1900). In 1956, the Court observed that this formal but economically meaningless distinction between taxes on Government obligations and taxes on separate interests was 'firmly embedded in the law.' *Society for Savings v. Bowers,* 349 U.S., at 148 [75 S.Ct. at 610]."

Congress amended § 3701 by the Act of September 22, 1959, § 105(a), 73 Stat. 621, 622, adding a new sentence: "This exemption extends to every form of taxation that would require that either the obligation or the interest thereon, or both, be considered, directly or indirectly, in the computation of the tax...." [4] In 1982, when § 3701 was replaced by 31 U.S.C. § 3124, there were no substantive changes. *American Bank and Trust Co. v. Dallas County, supra,* 463 U.S. at 859 n. 1, 103 S.Ct. at 3373 n. 1. *See generally Dept. of Assess. & Tax. v. Nat. Bank,* 310 Md.

---

**4.** There were exceptions to this provision, none of which are relevant in this case.

664, 667–669, 531 A.2d 294 (1987), *appeal dismissed,* 486 U.S. 1048, 108 S.Ct. 2812, 100 L.Ed.2d 913 (1988).

The Supreme Court has declared that the "exemption for federal obligations provided by [31 U.S.C. § 3124] ... is sweeping...." *American Bank, supra,* 463 U.S. at 862, 103 S.Ct. at 3374. There is a " 'long established Congressional intent to prevent taxes which diminish in the slightest degree the market value or the investment attractiveness of obligations issued by the United States in an effort to secure necessary credit.' " *Memphis Bank & Trust Co. v. Garner,* 459 U.S. 392, 396, 103 S.Ct. 692, 695, 74 L.Ed.2d 562 (1983), quoting *Smith v. Davis,* 323 U.S. 111, 117, 65 S.Ct. 157, 160, 89 L.Ed. 107 (1944). *See Matz v. Department of Treasury, supra,* 155 Mich.App. at 783–784, 401 N.W.2d at 65 (state taxation of mutual fund distributions, derived from interest on federal debt obligations, violates this prohibition).

In *American Bank and Trust Co. v. Dallas County, supra,* the Supreme Court held that a Texas property tax on bank shares, computed on the basis of a bank's net assets with no deduction for tax-exempt United States obligations held by the bank, violated § 3124. The Court set forth the principle that a "tax is barred regardless of its *form* if federal obligations must be considered, either directly or indirectly, in *computing* the tax." 463 U.S. at 862, 103 S.Ct. at 3375 (emphasis in original). The language of the federal statute was found to be "inconsistent with implied exceptions." 463 U.S. at 864, 103 S.Ct. at 3375. Two years later, in *First Nat. Bank of Atlanta v. Bartow County Bd.,* 470 U.S. 583, 105 S.Ct. 1516, 84 L.Ed.2d 535 (1985), the Court examined the scope of the exemption that must be provided in a state bank share tax, but did not in any way depart from *American Bank* 's holding concerning the forms of taxation that must allow an exemption for federal obligations. 470 U.S. at 589, 105 S.Ct. at 1520.

Courts have unanimously applied § 3124 and *American Bank* to invalidate state attempts to tax mutual fund distributions derived from interest on federal obligations. In

*Brown v. Franchise Tax Bd., supra,* 197 Cal.App.3d at 304, 242 Cal.Rptr. at 812, the California court noted that such a tax was like the invalid tax in *American Bank* (which was measured by a bank's assets), in that it was imposed on shareholders. The court characterized the Franchise Tax Board's argument that the tax was not "measured directly or indirectly" by federal obligation income, because it was levied on dividends, as the type of "formal but economically meaningless" distinction which the 1959 amendment did away with. 197 Cal.App.3d at 304–305, 242 Cal.Rptr. at 813.

In *Andras v. Illinois Dept. of Revenue, supra,* 154 Ill.App.3d at 42, 106 Ill.Dec. at 735, 506 N.E.2d at 442, the Illinois court was "unable to discern any conceptual distinction between the 'formalistic theory' distinguishing a shareholder's property interest from the entity's assets [rejected in *American Bank*] and the department's theory that a shareholder's dividend income is distinguishable from the entity's income where . . . the Trust's *entire* net income is paid regularly to its shareholders."

The Michigan court in *Matz v. Department of Treasury, supra,* 155 Mich.App. at 782, 401 N.W.2d at 64, concluded that the Department of Treasury's argument, that the shareholder in a mutual fund holds shares " 'in basically the same manner that she would hold shares in . . . any . . . corporate entity,' " and has no ownership right in the fund's ownership of United States government securities, "elevates form over substance."

The Supreme Court of Oregon, in *Borg v. Dept. of Rev., supra,* 308 Or. 34, 774 P.2d at 1101, held that § 3124 "leaves no room for distinguishing between a tax on the investors' income from tax-exempt obligations and a tax on the value of their shares of assets including such obligations," even if the tax is on dividends.

The Supreme Court of Vermont, in *In re Thomas C. Sawyer Estate, supra,* 149 Vt. at 544, 546 A.2d at 785, held that because "the Trust distributed the net income from

these investments directly to the shareholders, the State's taxation of that income was unquestionably a tax on the interest income from federal obligations...."

In *Capital Preservation Fund v. Dept. of Rev., supra,* 145 Wis.2d at 844, 429 N.W.2d at 553, the Wisconsin court concluded that it could "see no way to read 31 U.S.C. sec. 3124(a) other than as a prohibition against state taxation of distributions of income from the Fund's and the Trust's investments."

Maryland income tax is based upon federal adjusted gross income. A state tax based on federal adjusted gross income is a tax on each and every component of that income. The State can not, however, tax every item which the Federal government can tax. *See In re Thomas C. Sawyer Estate, supra,* 149 Vt. at 544, 546 A.2d at 785–786 (where Vermont "piggybacked," *i.e.* computed its state tax as a fixed percentage of federal tax, but where an additional deduction for distributions derived from interest on federal obligations was necessary because "the federal revenue code only defines federal income tax law" and "federal law with respect to state taxation is set forth by § 3124(a)").

The mutual fund in this case, the Trust for Short–Term U.S. Government Securities, has since its inception distributed its entire net investment income to its shareholders. It is the very same mutual fund considered in the *Andras, Matz, Sawyer* and *Capital Preservation Fund* cases. The Comptroller argues, however, that these cases were wrongly decided, and urges us to adopt the following analysis (Appellant's Brief, pp. 21–23):

"If the mutual fund was an ordinary corporation investing in state and local obligations exempt from tax under I.R.C. § 103 ... a 'pass through' exemption would not be allowed, because of the corporate-shareholder distinction....

"The entity-shareholder [distinction] is also a fundamental building block within the taxation of regulated investment companies or mutual funds....

\*     \*     \*     \*     \*     \*

"[N]othing in either *American Bank,* the legislative history of the 1959 amendments to Rev.Stat. 3701, or any other federal statute abolishes the corporate-shareholder distinction for tax purposes—which distinction is ignored only in rare instances...."

Maryland can tax dividends from a regular C-corporation, even if those dividends are derived from interest on federal obligations. A C-corporation is clearly a separate entity for tax purposes. A mutual fund, however, is not the same type of entity. The Supreme Court, far from characterizing a mutual fund as a regular corporation, has adopted the following definition: "A mutual fund is a pool of assets, consisting primarily of portfolio securities, and belonging to the individual investors holding shares in the fund." *Burks v. Lasker,* 441 U.S. 471, 480, 99 S.Ct. 1831, 1838, 60 L.Ed.2d 404 (1979).

The Trust, as noted previously, is a regulated investment company (RIC) under subchapter M of the Internal Revenue Code. Since the 1930s, Congress has provided for a special *federal* tax treatment of RICs, as well as certain RIC dividends. Under current law a RIC may, if it meets certain conditions, pay dividends that retain, in the hands of shareholders, their federal tax character as capital gains, 26 U.S.C. § 852(b)(3)(B), as interest on state or local obligations (known as "exempt interest dividends"), 26 U.S.C. § 852(b)(5), and as income from sources within foreign countries, 26 U.S.C. § 853(b)(2). The Comptroller emphasizes that this tax scheme is "quite specific" (Appellant's Brief, p. 27) and "contains no ... general mandates" providing that a distribution retains its character as a particular type of income, once it has been distributed to a shareholder (Appellant's Reply Brief, p. 13). It is unimportant that there is no specific provision which passes through the RIC's interest on federal obligations so that it may be treated as such by shareholders on their federal returns. As earlier noted, interest on federal obligations is, in general, fully taxable by the United States. It would not make any sense for Congress to provide for a federal tax "pass

through" of this interest to shareholders, since it is subject to federal tax in the first place. Thus, the lack of any provision creating a "pass through" of interest on federal obligations in the Internal Revenue Code is irrelevant to the issue of whether federal law permits Maryland to tax RIC distributions derived from federal obligation interest. Pronouncements of Congress concerning mutual funds are, however, quite relevant.

Congress has recognized that mutual funds have a peculiar role in the national economy, having, prior to 1959, addressed their importance. The fund in this case is an open-end investment company under the Investment Company Act of 1940, ch. 686, 54 Stat. 789 (codified as amended at 15 U.S.C. §§ 80a–1 through 80b–21). A 1940 congressional finding, codified today at 15 U.S.C. § 80a–1(a)(4), provided that

"investment companies are affected with a national public interest in that ...

\* \* \* \* \* \*

(4) such companies are media for the investment in the national economy of a substantial part of the national savings and may have a vital effect upon the flow of such savings into the capital markets."

Given the congressionally recognized value of mutual funds as media for the investment of such substantial savings, we will not attribute to Congress the intent of allowing state taxation of distributions derived from interest on federal obligations.

We also doubt that Congress intended to permit a state to discriminate against investors with moderate means. In a paper submitted to the House Committee on Ways and Means only two months after passage of the 1959 Act, an attorney representing the National Association of Investment Companies explained that investment companies

"have permitted the person of moderate means to invest in securities with diversification of risk and expert investment management without being subjected to any greater

income tax burden than a wealthier individual who can secure those benefits without the pooling of his resources with those of others." House Comm. on Ways and Means, 86th Cong., 1st Sess., 3 *Tax Revision Compendium* 1653, 1658 (Comm. Print 1959) (statement of Edwin S. Cohen).

*See also* Senate Comm. on Finance, 94th Cong., 2d Sess., *Taxation of Interest on Debt Obligations Issued by State and Local Governments and on Withholding Federal Income Tax on Interest and Dividend Income: Hearing Before the Committee on Finance* 108, 135 (Comm. Print. June 7, 1976) (appendix to statement of Edwin S. Cohen) ("regulated investment companies ... offer to the investor of relatively modest means the advantages of continuous professional management and diversification of investment risk.... [and] provide a medium for large numbers of persons to pool their investment resources.")

In this case, before the Maryland Tax Court, Eugene F. Maloney, the senior vice-president and corporate counsel for the financial services holding company which constitutes the sponsor for the Trust, testified that United States treasury bills are typically sold in denominations "of ten thousand dollars up to a million dollars." He also testified that Federal Home Loan bank bonds are sold in "the same denominations." In contrast, there is no minimum purchase requirement for shares in the Trust "[o]n the individual level through a bank trust department."

A holding for the Comptroller would sanction a scheme that prohibits the states from taxing wealthy persons who can afford to invest directly in federal obligations, while permitting the states to tax persons of more moderate means who must pool their resources to make the same investments. *See Brown v. Franchise Tax Bd., supra,* 197 Cal.App.3d at 305, 242 Cal.Rptr. at 813 (RICs "are not ordinary corporations," but rather their "business is to provide a conduit for investment in federal securities by persons who might otherwise be unable or unwilling to enter that market").

The position taken by the Comptroller would foster another type of discrimination. The Supreme Court has held that a state tax that discriminates in favor of state obligations and against federal obligations violates 31 U.S.C. § 3124. In *Memphis Bank & Trust Co. v. Garner, supra,* the Court invalidated a Tennessee bank tax imposed on a bank's net earnings, where "net earnings" included income from obligations of the United States but excluded interest earned on Tennessee obligations. The Court stated that "[a] state tax that imposes a greater burden on holders of federal property than on holders of similar state property impermissibly discriminates against federal obligations." 459 U.S. at 397, 103 S.Ct. at 696.

More recently, in *Davis v. Michigan Dept. of Treasury,* 489 U.S. 803, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989), the Court held that Michigan's income tax scheme, which exempted retirement benefits paid by the state or its political subdivisions, but included retirement benefits paid by, *inter alia,* the federal government, violated principles of intergovernmental tax immunity.

In *Borg v. Dept. of Rev., supra,* 308 Or. 34, 774 P.2d 1099, the Supreme Court of Oregon applied the rationale of these two Supreme Court cases to Oregon's attempt to tax distributions derived from interest on federal obligations, while not taxing income from mutual funds investing in Oregon securities. The Court reasoned that *Davis*

"precludes applying different rules to carry the tax exemption of interest forward to mutual fund dividends paid from investments in the two kinds of obligations." 308 Or. 34, 774 P.2d at 1102.

A mutual fund that invests in state and local bonds can, under 26 U.S.C. § 852(b)(5), pay dividends that are federally tax-exempt. Thus, the amount of these dividends in the hands of shareholders is included in neither federal adjusted gross income nor the base figure for calculating Maryland tax, Art. 81, § 280. The Maryland Income Tax Division of the Comptroller of the Treasury has issued an interpretive opinion, asserting that

"interest-dividends on obligations of states other than Maryland and their subdivisions, flowing through from the mutual fund must be added to Federal adjusted gross income. Any flow-through of interest-dividends on obligations and securities of the State of Maryland and its political subdivisions will escape the modification addition and will be nontaxable." Maryland Income Tax Division, Administrative Releases, No. 5 (January 1, 1989).

The Attorney General of Maryland has approved of an earlier Income Tax Division Release containing identical language. 68 Op. Att'y Gen. 410, 414 (1983). In that opinion, the Attorney General took the position that there was no discrimination between State tax treatment of federal and state obligation interest, because "the discrepancy is the direct result of distinctions drawn by federal law" which provides for pass-through treatment of interest on Maryland, but not federal obligations. *Id.* at 416. This argument by the Attorney General is unsound. Were we to adopt it, the tax-exempt nature of interest on federal obligations would not pass through to the shareholders of a mutual fund. In contrast, the tax-exempt nature of interest on Maryland obligations would pass through. Such discrimination between the tax treatment of state and federal obligations would appear to be in violation of federal law. *Borg v. Dept. of Rev., supra,* 308 Or. 34, 774 P.2d at 1102.

In sum, there are several problems with the Comptroller's position. It would lead to a State tax that clearly uses interest from federal obligations as a factor in its calculation. Moreover, only those with enough resources to afford the typically high denominations of federal obligations would be able to enjoy the exemption from State tax mandated by Congress. Furthermore, shareholders of mutual funds investing in Maryland obligations would be able to pool their resources and receive a tax break, while shareholders in mutual funds investing in federal obligations could not.

Consequently, as a matter of federal law, the 53.55% portion of the distribution derived from interest on federal obligations is not subject to tax by the State.

## II.

■ We now address the 46.45% portion of the Trust's 1985 distribution to the Taxpayer, derived from the Trust's participation in repo transactions.

A repo is a two step transaction which derives its name from the second step. In step one a party who holds United States government obligations and who is seeking cash (the seller-borrower) sells the government obligations to a party who has available cash and who is seeking government obligations for an investment or for some trading purpose (the buyer-lender, in this case the Trust). At the time the contract is formed the buyer-lender agrees to sell back to the seller-borrower, and the seller-borrower agrees to repurchase, the obligations at a higher price than the price at step one. The repurchase is step two. Viewed from the perspective of the seller-borrower, the transaction is called a repo. When viewed from the standpoint of the buyer-lender, the transaction is called a reverse repo. In the matter before us the Trust engaged in reverse repos.[5]

---

5. For more information concerning repos and reverse repos see Logue, *Handbook of Modern Finance,* at 5–20 (1984); M. Stigum, *The Money Market,* Ch. 12, at 395 (rev. ed. 1983); Dunning, *Drafting Repurchase and Reverse Repurchase Agreements,* in Repurchase and Reverse Repurchase Agreements Revisited 187 (1984) (Practicing Law Institute Course Handbook Series No. 341); Dunning, *Diagrams Outlining Repurchase Transactions,* in Repurchase and Reverse Repurchase Agreements 11 (1982) (Practicing Law Institute Course Handbook Series No. 290); Rogers, *The Government Securities Market: In the Wake of ESM,* 27 Santa Clara L.Rev. 587 (1987); Snow, *Description of the Repo Market, and the Position of the Players,* in Repurchase and Reverse Repurchase Agreements 9 (1985) (Practicing Law Institute Course Handbook Series No. 368); Comment, *The Need for a Uniform Classification of Repurchase Agreements: Reconciling Investor Protection With Economic Reality,* 36 Am.U.L.Rev. 669 (1987); Note, *Repurchase Agreements and the Bankruptcy Code: The Need for Legislative Action,* 52 Fordham L.Rev. 828 (1984); Note, *The Characterization of Repurchase Agreements in the Context of the Federal*

The Taxpayer contends that this portion of the distribution is exempted from Maryland taxation by 31 U.S.C. § 3124. The Comptroller submits that this portion of the distribution is not derived from interest on federal obligations, and that in a repo the federal obligations are security for what is, in economic effect, a loan by the Trust to a seller-borrower.

The record before us consists of the testimony of the corporate counsel for the Trust and certain exhibits, including a specimen repurchase agreement. Based on that evidence we can present the specifics of the Trust's reverse repos.

The specimen repurchase agreement is a master contract stating the general provisions for a course of dealing. Particular terms for individual transactions are to be specified in the "confirmation" of a given transaction. The seller-borrower is called "seller" in the master contract. The subject matter is exclusively "obligations issued or guaranteed by the United States Government or agencies thereof ('eligible securities')." The "sale price" at step one is an amount specified in the confirmation, and the repurchase price at step two is that "sale price" plus the agreed upon "interest" for the period until repurchase specified in the confirmation. Income to the Trust results from the "interest rate" negotiated on repos by sellers and the Trust. The Trust's witness acknowledged that the interest carried by the United States government obligations underlying a repo "isn't really germane to the rate of return associated with the transaction." The transactional rate of return "is typically driven by the supply and demand for money at the particular time the transaction was entered into."

Step one in the transaction is accomplished by the Trust's causing the sale price to be credited to an account of the

---

*Securities Laws,* 61 St. John's L.Rev. 290 (1987); Note, *Lifting the Cloud of Uncertainty Over the Repo Market: Characterization of Repos as Separate Purchases and Sales of Securities,* 37 Vand.L.Rev. 401 (1984).

seller in immediately available funds and by the seller's transferring the securities to a designated "custodian." In the reverse repos done by the Trust, the elapsed time between the purchase by the Trust and the repurchase by the seller is "typically of extremely short duration, overnight, seven days and so forth."

Between steps in a repo the seller-borrower must maintain, daily, a margin of at least 102% of the sale price (in eligible securities) with the custodian, unless a greater margin is specified in the confirmation. The market value of the securities on any given day is determined by the bid quotations on the immediately preceding business day, plus accrued interest on the obligations.

Under the master agreement the seller-borrower has a right at any time, and from time to time, to withdraw securities which were transferred to the custodian and to substitute other eligible securities of a value sufficient to maintain margin. There is no express provision in the master agreement, and there is no evidence in the record, that the Trust may obtain the securities from the custodian or that the Trust may deal, for its own account, in the securities held by the custodian, absent a default by the seller. If the seller maintains margin, the Trust "pay[s] over to seller as soon as received all principal, interest and other sums paid by ... the issuer in respect of the securities and collected by the [Trust]." If the seller has failed to maintain margin, "the [Trust] may retain any such sums as Cash Collateral."

Should the market value of the securities, plus any cash collateral, exceed the margin percentage of the sale price, the seller, on one day's notice, may require the Trust to pay the excess to the seller.

Failure to repurchase on time is an event of default by a seller, as are the seller's making an incorrect representation of its financial condition and the seller's filing a petition for relief under the bankruptcy laws.

Upon payment by the seller of the sale price plus agreed interest "the [Trust] agrees to resell such securities and pay over all principal, interest and other sums paid by or on behalf of the issuer in respect thereof collected by the [Trust]" and not previously paid over to the seller.

The master agreement also provides that "in the event that a repurchase transaction hereunder is deemed not to be a sale" then "seller shall be deemed to have ... granted to the [Trust] a first security interest in and a lien upon, and to have pledged the Cash Collateral and Securities." The master agreement then declares that "[n]otwithstanding the foregoing sentence, it is the intention of the seller and the [Trust] that each such transaction shall be a 'sale' within the meaning of the New York Uniform Commercial Code."

The counsel from the Trust described that association's twofold purpose in using repos. They are "a strategy in terms of how we perceive the movement of short term interest rates" and they insure "adequate liquidity to honor redemption requests...." The rate of return is "at best a tertiary consideration."

It is clear that in these repos there is no direct investment by the Trust in the government obligations. Nor is there any contention that the interest carried by the underlying United States obligations, rather than the current cost of money and the seller-borrower's credit worthiness, determines the interest rate paid by the seller-borrower on repurchase. The income to the Trust in a repo is not paid by the United States to the Trust as interest on a government obligation held by the Trust, but is paid by the seller-borrower on repurchase.

Nevertheless, the Taxpayer submits that this portion of the distribution is within the protection of § 3124 because the Trust became the owner of government obligations. It seems to be the Taxpayer's position that any income realized from the ownership of United States obligations is exempt from state taxation, although the Taxpayer never describes a reverse repo as producing a short term gain on

the purchase and resale of federal obligations. We do not agree that, for tax purposes, these repos are sales transactions.

Although the transaction is in form a sale and repurchase, and despite the declared intention of the parties to effect a sale, the substance of the transaction for tax purposes is a loan by the Trust to the seller-borrower, secured by the pledge of government obligations.

As step one "purchaser," the Trust does not bear the risk of fluctuations in the market value of the United States obligations as would an owner of securities. The repurchase price is fixed at the first step and remains uninfluenced by subsequent market events. Nor is the price paid for the securities at step one intended to be market value, as might be expected in a purchase of securities. Under the margin requirements, market value must be at least 102% of the sale price.[6]

The seller-borrower is also required to post additional eligible securities if the minimum margin requirements are not maintained. This strongly indicates that the transfer of government obligations to the Custodian is to secure the seller-borrower's promise to repurchase, *i.e.*, to repay the funds used by the seller-borrower plus interest at the agreed rate. That indication is reinforced by the default provisions. Upon the seller-borrower's failure to repurchase when promised, the Trust may sell the obligations, and any excess sales proceeds over the amount of the seller-borrower's obligations are paid to the seller-borrower. Were the Trust the owner of the securities, the proceeds of a sale would be the Trust's.

Furthermore, during the term of the repo, income produced by the government obligations is applied to the benefit of

---

**6.** The differential between the market value of the securities delivered and the sale price, *i.e.*, the amount of margin, is called, in trade parlance, the "haircut." *See Matter of Bevill, Bresler, & Schulman Asset,* 67 B.R. 557, 567 (D.N.J.1986); M. Stigum, *The Money Market, supra,* at 400 (rev. ed. 1983).

the seller-borrower, either as cash collateral, if required, and if not, then payable to the seller-borrower from time to time or at termination. An owner by purchase of the securities would be entitled to the income.

Relying on substantially the reasoning set forth above, most state courts which have decided the issue have held that distributions to RIC shareholders derived from repo transactions are not exempt under § 3124(a). *See Department of Revenue v. Page,* 541 So.2d 1270 (Fla.App.1989); *Andras v. Illinois Dept. of Revenue, supra,* 154 Ill.App.3d 37, 106 Ill.Dec. 732, 506 N.E.2d 439; *Massman Const. v. Director of Revenue,* 765 S.W.2d 592 (Mo.1989); *Borg v. Dept. of Rev., supra,* 308 Or. 34, 774 P.2d 1099; *In re Thomas C. Sawyer Estate, supra,* 149 Vt. 541, 546 A.2d 784; *Capital Preservation Fund v. Dept. of Rev., supra,* 145 Wis.2d 841, 429 N.W.2d 551. *Contra, Matz v. Department of Treasury, supra,* 155 Mich.App. 778, 401 N.W.2d 62.

In support of the conclusion that repo transactions are sales, the Taxpayer also relies on *Matter of Bevill, Bresler & Schulman Asset,* 67 B.R. 557 (D.N.J.1986). That case involved the bankruptcies of a registered broker-dealer and of an unregulated secondary dealer in government securities, both of which engaged in repo and reverse repo transactions. The case is factually distinguishable from the matter now before us. The evidence there was that dealers acquiring securities in reverse repos actively traded the securities and substituted other securities to sell back to the repurchasing seller-borrower. This factual distinction was material to the court's analysis of whether there was a sale under New York and New Jersey law. Trading in the securities by the buyer-lender enabled the court to give effect, in the context of the entire market, to the prima facie evidence of a sale found in the recited intent of the parties.

In addition, the court in *Bevill* concluded that "the proper characterization of repo and reverse repo agreements does not rest solely on an evaluation of the economic substance

of the individual transactions" in determining bankruptcy issues involving whether various parties acquired ownership of, or a security interest in, the underlying obligations. 67 B.R. at 597. Here our concern is the taxability of distributions derived from repos and whether, for tax purposes, the income to the Trust generated by reverse repos can even be characterized as generated by the sale of government obligations. In this context, *Union Planters Nat. Bank of Memphis v. United States*, 426 F.2d 115 (6th Cir.), *cert. denied*, 400 U.S. 827, 91 S.Ct. 53, 27 L.Ed.2d 56 (1970), is instructive.

In *Union Planters Nat Bank*, dealers in state and local bonds had, over a period of years, bought new issues of bonds and sold those for which the dealers did not have immediate customers to the taxpayer bank, subject to an agreement which recited that the bank could require repurchase by the dealers at any time at the price paid by the bank. In practice, however, the bonds could be reacquired by a dealer at the dealer's request, which usually coincided with the dealer's having found a customer for the repurchased bonds. While holding the bonds in its name, the bank collected the interest which the bonds carried, and the bank sought to deduct that interest under 26 U.S.C. § 103. The Government would not allow that deduction, claiming that in economic effect the bank loaned money to the dealers, with which to purchase the bonds, and that the interest on the loans was equivalent to the interest paid by the bonds. The court sustained the Government's position and reversed a contrary judgment by the district court. The United States Court of Appeals for the Sixth Circuit, speaking through Judge McCree, reasoned as follows (426 F.2d at 117–118):

"We do not agree that subjective intent is decisive here. The intent of the parties may be important in determining just what their contractual relations *inter sese* were, but there is little dispute here about what obligations and rights the parties expected their agreement to confer. This case hinges, rather, on the legal characterization, for

federal income tax purposes, of the transactions between the parties. That characterization is not a question of fact, but rather one of law."

*        *        *        *        *        *

"In cases where the legal characterization of economic facts is decisive, the principle is well established that the tax consequences should be determined by the economic substance of the transaction, not the labels put on it for property law (or tax avoidance) purposes.... 'In the field of taxation, administrators of the laws, and the courts, are concerned with substance and realities, and formal written documents are not rigidly binding.' *Helvering v. F. & R. Lazarus & Co.*, 308 U.S. 252, 255, 60 S.Ct. 209, 210, 84 L.Ed. 226 (1939)."

In the present case, arguments concerning the sale versus secured loan dispute were submitted to the Tax Court and were addressed in the following passage from the Tax Court's opinion:

"They [the shareholders] are letting their money flow in that direction because they feel and know that the interest income that's received from it [*i.e.,* a reverse repo] is going to be tax exempt. That's the real reason that they are doing that.

"So that although we can see how in cold, hard, legal terms it could be called a loan to [a seller-borrower] the person is investing their money so that they can reap a tax free interest return."

As a finding of fact, the above passage is not only unsupported by, but is contrary to, the record. The January 1985 prospectus of the Trust, under the heading "Shareholders' Tax Status," reads: "Shareholders are urged to consult their own tax adviser regarding the status of their account under state and local tax laws." In addition, the finding of fact, in the present context, is legally irrelevant. The characterization of a reverse repo transaction between an RIC buyer-lender and a seller-borrower is not determined by the expectations of shareholders of the RIC. Finally,

like the determination in one of this Court's previous cases of whether the domestic placement interest income of a corporation was income from its unitary business, classification of the Trust's repo transaction income is a question of law. *See NCR Corp. v. Comptroller,* 313 Md. 118, 544 A.2d 764 (1988).

We hold that the 46.45% portion of the distribution derived from the Trust's participation in repo transactions is not exempt from Maryland income tax.

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED IN PART AND REVERSED IN PART. CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REMAND THE CASE TO THE MARYLAND TAX COURT FOR THE ENTRY OF AN ORDER CONSISTENT WITH THIS OPINION. COSTS TO BE EQUALLY DIVIDED.

RODOWSKY, J., dissents, in which MURPHY, C.J. and ADKINS, J. join.

RODOWSKY, Judge, dissenting.

I respectfully dissent from Part I of the Court's opinion and from the resulting partial affirmance of the order for refund. The Court has compromised, severely and gratuitously, the separate entity theory, one of the foundations of an income tax system.

The Trust for Short–Term U.S. Government Securities (the Trust), whose distributions to shareholders are involved here, is a Massachusetts business trust and a regulated investment company (RIC) under subchapter M of the Internal Revenue Code (IRC).[1] Associations doing business in the form of Massachusetts business trusts are taxable as corporations. *See* IRC § 7701(a)(3); *Morrissey v. Commissioner,* 296 U.S. 344, 56 S.Ct. 289, 80 L.Ed. 263 (1935); *Hecht v. Malley,* 265 U.S. 144, 44 S.Ct. 462, 68 L.Ed. 949 (1924); 10 J. Mertens, *The Law of Federal Income Taxa-*

---

**1.** All citations to the IRC are to provisions applicable to calendar 1985.

*tion* § 38A.36, at 90 (1989). The "definition of 'corporation' for the State income tax laws [is] similar to the definition used in the federal income tax laws." Revisor's Note to Md.Code (1988), § 10–101(b) of the Tax–General Article.

A corporation and its shareholders are separate entities. Income received by the corporation is taxed to it. Dividends paid out of that same income are also taxed to the shareholders. The separate taxation of corporation and shareholder is not affected, absent statute, by the fact that the corporation regularly distributes all, or nearly all, of its net income to shareholders. *See National Carbide Corp. v. Commissioner*, 336 U.S. 422, 69 S.Ct. 726, 93 L.Ed. 779 (1949).

Here the Trust derives income from two sources, interest paid to it by the United States on federal obligations owned by the Trust, and income from the repo transactions. From its total income the Trust pays all of the salaries, fees, commissions, perquisites and other business expenses and capital expenditures required in operating a mutual fund. It then pays the net income to shareholders. By computing the ratio which total federal obligation interest paid to the Trust bears to the Trust's gross income from all .sources, and then by applying that ratio (53.55%) to its distribution of net income to shareholders, the Trust derives an amount which it contends is still interest on federal obligations and exempt from taxation.

For the shareholders to escape state taxation it is not sufficient that the income from federal obligations received by the Trust is exempt from state taxation of the Trust's income. *See* Md.Code (1957, 1980 Repl.Vol., 1984 Cum. Supp.), Art. 81, § 280(c)(1). In order for the dividend paid by the corporation to the shareholder to be immune under principles of intergovernmental immunity, it is necessary (1) for the law to consider that a dividend is apportionable according to the various types of income received by the dividend payor and (2) for that portion of the dividend prorated on the basis of total federal obligation interest to total corporate income to continue to carry that same char-

acter as federal obligation interest after distribution by the corporation to the shareholder.

Nothing in IRC subchapter M, relating to RICs, achieves that result. Highlighting that conclusion is a comparison of the provisions dealing with partnerships and with "S" corporations to the provisions relating to RICs. IRC § 1366(b) deals with the tax treatment of shareholders of an "S" corporation. It provides that "[t]he character of any item included in a shareholder's pro rata share [of corporate income] shall be determined as if such item were realized directly from the source from which realized by the corporation, or incurred in the same manner as incurred by the corporation."

IRC § 701 provides that "[a] partnership as such shall not be subject to the income tax imposed by this chapter." Section 702(b) provides that, in determining the income tax of each partner, "[t]he character of any item of income ... included in a partner's distributive share ... shall be determined as if such item were realized directly from the source from which realized by the partnership[.]"

Congress knows how to express clearly an intent that income, distributed from one entity to another, retain, after distribution, the same character which the income had when received by the distributing entity. Congress has not done so with respect to federal obligation interest income of RICs.

With respect to RICs there are provisions which allow an RIC to avoid taxation at the corporate level. The provisions of the IRC under which a RIC may avoid federal taxation are described in Hervey, T.M. Port. No. 10, *Taxation of Regulated Investment Companies*, at A–1 (1987) (Hervey).

"Under the RIC provisions ( [IRC] §§ 851–55, § 860), a domestic corporation or business trust registered with the Securities and Exchange Commission as an investment company under the provisions of the Investment Company Act of 1940 may elect to be a RIC for a taxable year if it satisfies certain requirements relating to the source of

its income and the diversification of its assets. If a RIC satisfies certain additional requirements relating to the distribution of its net income, the RIC will generally be taxed as a pass-through entity which acts as a *partial 'conduit'* of income to its shareholders. Such conduit treatment is achieved by allowing a qualifying RIC to deduct the amount of dividends paid to its shareholders in computing the RIC's taxable income, with the result that the RIC's distributed net income can be passed through to its shareholders free of tax at the corporate level."

(Emphasis added). The availability of the above-described deduction to the RIC does nothing to assist the shareholder in attributing to a dividend received the character of the income received by the RIC.

A RIC, however, may pay a capital gain dividend, as defined in IRC § 852(b)(3)(C) which "shall be treated by the shareholders as a gain from the sale or exchange of a capital asset held for more than 6 months." § 852(b)(3)(B).

The federal income tax treatment of interest on state obligations received by RICs is also instructive on the problem in this case. With exceptions not relevant here federal gross income does not include interest on the obligations of a state. IRC § 103(a). "Interest on such tax-exempt obligations is also not included in the gross income of a RIC for purposes of computing the RIC's investment company taxable income." Hervey, at A–54. Under IRC § 852(b)(5) a RIC, under certain conditions, "is permitted to pass through to its shareholders the tax-exempt character of the RIC's net income from tax-exempt [state] obligations ... through the payment of 'exempt-interest dividends.'" Hervey, at A–54 (footnote omitted). This retention in the dividend paid by the RIC of the character of exempt state interest received by the RIC is effected by the language of § 852(b)(5)(B). It states that "[a]n exempt [state] interest dividend shall be treated by the shareholders for all purposes of this subtitle as an item of interest excludable from gross income under section 103(a)...." The quoted language is, of course, a statutory modification of the separate

entity principle. There is no comparable provision retaining in the hands of shareholders the character of federal obligation interest received by a RIC.

The majority opinion says that the absence of a character retention provision for federal obligation interest is irrelevant because federal obligation interest is federally taxable. But the point relevant to the instant problem is that the Trust's distribution to a shareholder comes onto a shareholder's federal return, and hence, onto the Maryland return, as a dividend because nothing in federal law preserved the character of the federal interest as federal interest after distribution.

Thus, the result reached by the majority rests solely on 31 U.S.C. § 3124(a). As a result the holding in this case cannot be limited on any principled basis to mutual funds. Whether mutual funds which concentrate their investments in federal obligations are good for the economy is not legally germane.[2] The issue is whether Maryland's income tax requires "the interest on the obligation ... to be considered in computing [the] tax" on the shareholder, within the meaning of 31 U.S.C. § 3124(a).

Maryland's tax on this dividend is not computed by considering interest on a federal obligation. Federal obligation interest is part of the gross income of the Trust. The Maryland tax is computed on the Taxpayer's taxable income, which in turn includes a dividend from the Trust, which in turn is part of the net income of the Trust, which

---

**2.** If the national economic policy of prohibiting state taxation is as clear-cut as counsel for the Taxpayer (*i.e.,* the Trust) argues, one wonders why Congress has never legislated that the portion of mutual fund dividends originating in federal obligation interest is itself characterized as federal obligation interest. In fact, thirteen states administratively tax mutual fund distributions regardless of whether federal obligation interest is a component of that distribution on the theory that the exempt interest does not retain its character when distributed by the mutual fund. *See State Taxation of Income from Mutual Funds or Money Market Accounts Invested in U.S. Government Securities,* Federation of Tax Administrators, Research Report No. 122, at 7–9 (Jan. 1988).

in turn is the gross income of the Trust, less expenses. That gross income of the Trust includes interest on federal obligations. The majority opinion reaches its conclusion by stirring the Trust and its shareholders together in one bowl of indistinguishable, economic mush.

The majority opinion favorably cites cases from other states which, in my view, fall into the same mistaken approach. Thus, the distinction between interest to the Trust and a dividend to its shareholders is denounced as a " 'formal but economically meaningless' distinction." Maj. opinion at 360 (quoting *Brown v. Franchise Tax Bd.*, 197 Cal.App.3d 300, 304–05, 242 Cal.Rptr. 810, 813 (1987)). The separate entity doctrine " 'elevates form over substance.' " Maj. opinion at 360 (quoting *Matz v. Department of Treasury*, 155 Mich.App. 778, 782, 401 N.W.2d 62, 64 (1986)).

The federal constitution does not require this wholesale "trashing" of tax and corporate law principles. Decisions of the Supreme Court " 'have treated [§ 3124] as principally a restatement of the constitutional rule.' " *South Carolina v. Baker*, 485 U.S. 505, 526, 108 S.Ct. 1355, 1368, 99 L.Ed.2d 592, 612, *reh'g denied*, 486 U.S. 1062, 108 S.Ct. 2837, 100 L.Ed.2d 937 (1988) (quoting *Memphis Bank & Trust Co. v. Garner*, 459 U.S. 392, 397, 103 S.Ct. 692, 695, 74 L.Ed.2d 562, 567 (1983)). Supreme Court decisions dealing with a property tax on intangibles illustrate how the constitutional immunity is violated and how the immunity's sweep is not nearly so great as the majority opinion would make it here.

*American Bank & Trust Co. v. Dallas County*, 463 U.S. 855, 103 S.Ct. 3369, 77 L.Ed.2d 1072, *reh'g denied*, 463 U.S. 1250, 104 S.Ct. 39, 77 L.Ed.2d 1457 (1983), held that a property tax on bank shares valued at the net worth of the issuing bank, without any exclusion for federal obligations held by the bank, infringed federal immunity. The problem presented in *American Bank* may be demonstrated by an oversimplification. Assume a bank which has 100 stock- holders, each of whom owns one share. The bank has no real estate and presents the following balance sheet:

| | |
|---|---|
| $ 2,500 U.S. Obligations | $ 7,500 Liabilities |
| 7,500 Other Assets | 2,500 Net Worth |
| $10,000 | $10,000. |

A tax assessor, proceeding in the same fashion as the assessor in *American Bank,* would value the bank shares in our example at $25 per share ($2,500 net worth divided by 100 shares). Utilizing all of the federal obligations to determine the bank's net worth and thereby value the shares, in the words of § 3124(a), "require[d] the obligation ... to be considered in computing [the] tax."

*First Nat'l Bank v. Bartow County Bd. of Tax Assessors,* 470 U.S. 583, 105 S.Ct. 1516, 84 L.Ed.2d 535 (1985), also involved a property tax on bank shares which, by state law, were to be valued at the net worth of the issuing bank. The assessor in *First Nat'l Bank* sought to avoid the constitutional violation found in *American Bank* by proceeding somewhat differently. The assessor recast the balance sheet by eliminating all federal obligations as assets, but the assessor also reduced liabilities by a percentage equal to the ratio of U.S. obligations to total assets. Using the same oversimplified example set forth above, that balance sheet presented on the *First Nat'l Bank* model would appear as follows:

| | |
|---|---|
| $ 0 U.S. Obligations | $5,625 Liabilities |
| 7,500 Other Assets | 1,875 Net Worth |
| $7,500 | $7,500. |

The share tax would then be applied to stock valued at $18.75 per share. The same mathematical result would be obtained if the liabilities were not reduced at all and United States obligations were reduced from $2,500 to $1,875.

| | |
|---|---|
| $1,875 U.S. Obligations | $7,500 Liabilities |
| 7,500 Other Assets | 1,875 Net Worth for |
| | Tax Valuation |
| $9,375 | $9,375. |

The Court in *First Nat'l Bank* recognized that a rule which required the elimination from assets of all U.S. obligations, without an adjustment in liabilities, would permit a bank to shelter its shareholders by maintaining U.S. government obligations in an amount equivalent to net

worth. "The tax exemption required by the Constitution and [§ 3124(a)] is not a tax shelter." *Id.* at 597, 105 S.Ct. at 1524. The connection, which was constitutional, between the federal obligations owned by First National Bank and the tax on the shares held by its stockholders seems to me to be closer than the attempted connection between shareholders and federal obligation interest income paid to a corporation, passed through that entity, reduced by expenses, and then paid out as dividends.

*Memphis Bank & Trust Co. v. Garner,* 459 U.S. 392, 103 S.Ct. 692, involved subparagraph (1) of § 3124(a) which recognizes that there is no constitutional immunity from a nondiscriminatory, nonproperty tax which is in lieu of a franchise tax imposed on a corporation. Tennessee taxed the net earnings of banks and, in defining net earnings, included income from obligations of the United States but excluded interest earned on the obligations of Tennessee and its political subdivisions. This discriminatory feature excluded the tax from the protection of subparagraph (1) of § 3124(a). In *South Carolina v. Baker,* 485 U.S. 505, 108 S.Ct. 1355, the Court, referring to *Memphis Bank & Trust Co.,* said that "this Court has in effect acknowledged that a holder of a government bond could constitutionally be taxed on bond interest[.]" *Id.* at 526, 108 S.Ct. at 1368. The principle applied was that "[w]here ... the economic but not the legal incidence of the tax falls upon the Federal Government, such a tax generally does not violate the constitutional immunity if it does not discriminate...." *Id.* (quoting *Memphis Bank & Trust Co.,* 459 U.S. at 397, 103 S.Ct. at 695). Maryland's tax on the Trust's dividend in the hands of its shareholders places the legal incidence of the tax on the shareholder. Any effect on the federal government is an economic ripple.

The majority opinion characterizes as "unsound" the opinion of the Attorney General of Maryland, 68 Op.Att'y Gen. 410 (1983), which approved the manner in which the Comptroller applies the income tax in situations of the type presented here. Maj. opinion at 366. In a RIC sharehold-

er's Maryland return, based upon the shareholder's federal return, the portion of a RIC dividend representing interest on state obligations retains its character as interest on state obligations and is not taxed by Maryland. See IRC § 103; Art. 81, § 280(c)(1). The portion of a RIC dividend proportional to interest on federal obligations, which does not retain its character as interest on the shareholder's federal return, is taxed as a dividend by Maryland. The majority concludes that this difference in result "would appear to be in violation of federal law." *Id.* This dissenting opinion has taken pains to demonstrate that the difference in character of the income received by the shareholder results from differences in treatment by the Internal Revenue Code. I am at loss to understand how Maryland can be discriminating against federal obligations when Maryland simply takes as the starting point for the Maryland return the characterizations of shareholder income effected by federal law and reflected on the federal return. The Trust's distribution to shareholders is a dividend for federal purposes. The distribution is a dividend for State purposes.

Further, by holding that federal immunity overrides the traditional treatment of corporation and shareholder as separate entities, the majority opinion furnishes a justification for shareholders of ordinary business corporations to consider as immune from state taxation a portion of their dividends representing the pro rata share of gross corporate income derived from corporate investment in federal obligations. When the majority chooses to ride the horse of § 3124(a), nothing restrains the beast to the path of RICs which earn *part* of their income from interest on federal obligations.

I would entirely deny the claim for refund.

MURPHY, C.J., and ADKINS, J., authorize me to state that they join in the views expressed in this dissenting opinion.